MARCUSO, Appellant,

v.

UNIVERSITY OF CINCINNATI, Appellee.

[Cite as *Marcuso v. Univ. of Cincinnati,* 150 Ohio App.3d 69, 2002-Ohio-6026.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 02AP–270.

Decided Nov. 5, 2002.

Sirkin, Pinales, Mezibov & Schwartz L.L.P., Marc D. Mezibov and Michael N. Budelsky, for appellant.

Betty D. Montgomery, Attorney General, and Larry Y. Chan, Assistant Attorney General, for appellee.

BOWMAN, Judge.

{¶ 1} On October 29, 1999, appellant, Dr. Marc Marcuso, filed a complaint in the Ohio Court of Claims against appellee, the University of Cincinnati ("University"), alleging that he had been wrongfully terminated in violation of Ohio public policy. The trial court found that appellant had failed to prove by a preponderance of the evidence that the termination of his employment violated public policy. Appellant filed a notice of appeal and raises the following assignment of error:

{¶ 2} "The trial court's decision in favor of defendant on plaintiff's claim for termination in violation of public policy was contrary to law."

{¶ 3} Appellant received his Ph.D. in physics from the University in 1979 and became employed in its physics department in 1984. In April 1985, appellant donated $400 to the University and deposited it into a restricted gift fund called the Physics Educational Laboratory Fund. When appellant set up the fund, he specified that the general purpose of the fund and restriction on the use of the fund were as follows: "Shall be used solely to meet hardware expenses involved in the development of new physics-related experiments for undergraduate students."

{¶ 4} In 1990, appellant also donated $150 to the fund as the result of his work assisting a movie-production company that filmed a portion of a movie on campus. Beginning in 1986, a third contribution to the fund came from an agreement with Tichenor Publishing Group, by which ten percent of the royalties from the sales of a lab manual were deposited into the fund. Appellant had been one of four authors of the manual when he was a teaching assistant in 1974, and did not believe that he was personally entitled to the royalties.

{¶ 5} In July 1997, appellant wanted to purchase some overhead projector systems for use in classrooms by teaching assistants and contacted the University of Cincinnati Foundation to determine how much money remained in the fund. He was told the fund was depleted. Appellant began to investigate how the money had been spent and contacted the internal audit services department to

request a transaction history of the fund. The money had been spent in February 1992, on new carpet for the laboratory in which appellant worked.

{¶ 6} As a result of appellant's request, the audit department sent an inquiry and the transaction history to the Dean of the College of Arts and Sciences. The Dean contacted the head of the physics department, who consulted with the physics department business manager and determined that the expenditure of funds was legitimate.

{¶ 7} Appellant testified that he became aware of a rumor that he was trying to get the head of the physics department, Dr. Peter Suranyi, in trouble by instituting the audit. He attempted to discuss his concerns with Dr. Suranyi, regarding the use of the fund and his belief that the fund had been misused. Appellant believed that a conflict of interest existed between his supervisors, Dr. Richard G. Gass and Dr. Richard Newrock, and himself since he believed that Dr. Gass attempted to take credit for his idea regarding image capture experiments using video. His relationship with his other supervisor, Dr. Newrock, deteriorated because appellant believed that Dr. Newrock broke promises to develop a budget for appellant's lab. Appellant argued as well that Dr. Newrock objected to the passage of rights from the University to appellant to a data-acquisition instrument that appellant had designed. The two had a disagreement in 1991 over appellant's job duties and Dr. Newrock had threatened to fire appellant. Appellant believed that one or both of his supervisors wanted him fired as retaliation for his initiating the audit.

{¶ 8} In appellant's review dated June 1998, Dr. Gass listed that one of the problems appellant was having was working with other members of the department, and an example given was that he filed a complaint with the University alleging misuse of funds without bringing the problem to the attention of the department head first. Dr. Gass wanted to meet with appellant to discuss his yearly evaluation, but appellant refused to meet in Dr. Gass's office because they had met in appellant's office in the past and appellant feared a confrontational meeting.

{¶ 9} Dr. Gass delivered a letter to appellant on June 15, 1998, rescheduling the evaluation meeting for Tuesday, June 16, 1998, in Dr. Gass's office, but appellant again failed to appear. In July 1998, appellant received another letter from Dr. Suranyi and Dr. Brian Meadows, another professor of physics who had been chosen as the next department head, which outlined the need for his cooperation in the renovation of the physics department building and stated his new responsibilities, including supervising a new staff member. Appellant was expected to sign the letter as an acknowledgement of his agreement by July 9, 1998; however, appellant refused to sign the letter and, in a letter dated July 28, 1998, appellant's services were terminated with six months' notice.

{¶ 10} Appellant subsequently filed this action in the Ohio Court of Claims, claiming that his termination was a violation of public policy. The trial court found that appellant had failed to prove by a preponderance of the evidence that the termination of his employment violated public policy and rendered judgment in appellee's favor.

{¶ 11} Judgments which are supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

{¶ 12} In *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981, the Supreme Court of Ohio recognized an exception to the employment-at-will doctrine that generally governs employment relationships in Ohio. Traditionally, under the doctrine, a general or indefinite hiring is terminable at the will of either party. *Collins v. Rizkana* (1995), 73 Ohio St.3d 65, 67, 652 N.E.2d 653. In *Greeley*, the court recognized a cause of action in tort for wrongful discharge in violation of public policy where an employee is discharged or disciplined for a reason that is prohibited by statute. In *Painter v. Graley* (1994), 70 Ohio St.3d 377, 639 N.E.2d 51, the court found that, to state a claim of wrongful discharge in violation of public policy, a plaintiff must demonstrate that the employer's act of discharging him violated a "clear public policy." The court stated that the existence of a "sufficiently clear public policy" may be discerned by the judiciary based on sources such as the Ohio and United States Constitutions, legislation, administrative rules and regulations, and the common law; however, the court cautioned that an exception to the traditional doctrine of employment at will should be recognized only where the public policy alleged to have been violated is of equally serious import as the violation of a statute.

{¶ 13} The court in *Painter* further stated that finding a sufficiently clear public policy is the first step in establishing a right to recover for the tort of wrongful discharge in violation of public policy and that the plaintiff must also establish the other required elements of the tort of wrongful discharge. The court set forth the elements of this tort at 384, in fn. 8, as follows by quoting H. Perritt, The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie? (1989), 58 U.Cin.L.Rev. 397, 398–399:

{¶ 14} " '1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).

{¶ 15} " '2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).

{¶ 16} " '3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).

{¶ 17} " '4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).' (Emphasis sic.)"

{¶ 18} The Supreme Court of Ohio adopted these elements in *Collins* at 69–70, 652 N.E.2d 653. In *Collins,* the court stated that the clarity and jeopardy elements are questions of law to be determined by the court, but the causation and overriding justification are factual issues for the fact finder to decide.

{¶ 19} Appellant argues that the trial court erred in two respects, first, the trial court misconstrued the elements of wrongful discharge in violation of public policy and, second, also misconstrued the public policy upon which appellant based his claim.

{¶ 20} Appellant articulated as the basis for his claim the public policy of protecting and promoting the right of an individual to donate money to a university and to direct how the money is to be used. Appellant argues that the public policy derives from R.C. 3345.16, which provides:

{¶ 21} "The board of trustees of a state college or university may receive, and hold in trust, for the use and benefit of the college or university any grant or devise of land, and donation or bequest of money or other personal property, to be applied to the general or special use of the college or university, including the use for student loan and scholarship purposes, unless otherwise directed in the donation or bequest."

{¶ 22} Appellant contends that he also established the jeopardy element as a matter of law because public policy is jeopardized if an employer can ignore a statute and then fire an employee for complaining about it, as in this case where appellant contends that his employment was terminated because he complained about how the money in the physics fund was spent. Appellant argues that the facts establish the final two elements of the tort because his dismissal was related to his conduct in instituting the audit and that appellee lacked an overriding business justification for his dismissal.

{¶ 23} In this case, the trial court found that appellant may have been attempting to assert a claim under R.C. 4113.52, Ohio's Whistleblower Protection Act, and that he did not comply with that statute and, therefore, the claim lacked merit; however, the trial court also analyzed appellant's claim, pursuant to R.C. 3345.16, which appellant argues is the only public policy that his claim is based

upon. The trial court found that, assuming that appellant had met the first two elements of the tort, the clarity element and the jeopardy element, he failed to prove by a preponderance of the evidence that the termination of his employment was motivated by his conduct in instituting the internal audit and, thus, he failed to prove the fourth element, the overriding justification element, of his tort claim.

{¶ 24} Regardless of whether the trial court erred by addressing the Whistleblower Act, the trial court found that appellant failed to prove by a preponderance of the evidence that the termination of his employment was motivated by his conduct regarding the internal audit. The trial court found that the evidence showed that appellee's decision was "primarily related to concerns about plaintiff's communication skills, lack of cooperation and problematic relationships with employees in the physics department."

{¶ 25} There is competent credible evidence going to all of the essential elements to support the trial court's findings in this case.

{¶ 26} In his 1996 performance evaluation, before his audit request, Dr. Gass advised appellant of the need to have better communication with the other members of the department. In his 1997 performance evaluation, Dr. Gass noted that appellant behaved unprofessionally during the preparation of the department's Ohio Board of Regents' request by repeatedly ignoring requests for information that would have strengthened the request. Dr. Gass also noted that appellant needed to improve cooperation and communication with other members of the department. In his 1998 performance evaluation, there were several instances listed of appellant's refusal to cooperate with other members of the department. For example, Dr. Gass listed that appellant had filed a complaint with the University alleging misuse of department funds before approaching the department head, he refused to attend a meeting until instructed to do so by the department head, he failed to respond to his supervisor's and the facility committee chairman's requests for a list of goals for 1999, he failed to respond to a request for input on the renovation of Braunstein Hall in which he worked, he failed to respond to two requests to attend a meeting to discuss his evaluation, and was generally insubordinate to everyone except the department head. Dr. Gass also noted that cooperation and collaboration with other department members has been a continuing problem and had not improved, even though it had been mentioned in his last two evaluations. His numerical rating on his performance evaluation decreased in each of these years.

{¶ 27} Both Dr. Gass and the department head at that time, Dr. Suranyi, testified that appellant's employment was terminated because he was insubordinate and refused to sign the letter that outlined his new duties. Dr. Gass testified that he was not angry that appellant had made an inquiry into the use of the funds, although he did express anger that appellant had not approached the

department head first; however, Dr. Gass testified that mentioning the incident in appellant's performance evaluation was a form of discipline. Dr. Suranyi testified that, at the conclusion of the investigation into the use of the fund, it was determined that there was no impropriety.

{¶ 28} Dr. Newrock testified that he did not intend to retaliate against appellant. Dr. Brian Meadows testified that he did not think that the audit was ever discussed as a reason for appellant's employment being terminated.

{¶ 29} The trial court concluded, and we agree, that, based upon the testimony and evidence presented, appellant did not prove that his dismissal was motivated by his action in instituting the internal audit. Appellee had a legitimate overriding business justification for its decision to terminate appellant's employment. Appellant's lack of cooperation for several years and his refusal to accept his new duties constituted a legitimate overriding business justification for its decision to terminate appellant's employment. Thus, appellant failed to present evidence on all of the elements of the tort for wrongful discharge in violation of public policy. Appellant's assignment of error is not well taken.

{¶ 30} For the foregoing reasons, appellant's assignment of error is overruled, and the judgment of the Ohio Court of Claims is affirmed.

Judgment affirmed.

PEGGY BRYANT and LAZARUS, JJ., concur.