JOURNAL ENTRY and OPINION.
{¶ 1} Plaintiff Kelly Sorensen alleged that she had been terminated in violation of public policy when she refused to falsify discharge disposition codes on Medicaid forms as instructed by her employer, defendant Kate Wise, a principal of defendant Wise Management Services, Inc. The court granted summary judgment to Wise. The primary issue on appeal is whether Sorensen carried her burden of proving an issue of material fact on the wrongful discharge claim.
 {¶ 2} Summary judgment may be granted as a matter of law when there is no genuine issue of material fact, the moving party is entitled to judgment as a matter of law and reasonable minds can come to but one conclusion and that conclusion is adverse to the non-moving party. See Civ.R. 56(C); Temple v. Wean United (1977), 50 Ohio St.2d 317, 327. Because the court granted summary judgment adversely to Sorensen, we view the facts in a light most favorable to her. Id.
 {¶ 3} Wise Management provides account resolution services to health care providers by assisting their clients in collecting unpaid accounts. Sorensen worked for Wise Management as a discharge disposition clerk with responsibilities to process and submit claims for reimbursement to Medicaid on behalf of Wise Management's clients.
 {¶ 4} Sorensen claims that the events leading to her termination must be viewed in the context of procedures established by Summa Health Systems, one of Wise Management's clients. In 2000, Summa settled litigation with the federal government over its billing practices with government health agencies by agreeing to conduct training seminars for its employees and independent contractors. These seminars, as alleged by Sorensen, angered Wise Management because they detracted from the work Wise wished its employees to do. In other words, when they were in compliance training with Summa, the employees were being paid by, but not actually working for, Wise Management.
 {¶ 5} Set against this backdrop were four Medicaid claims that had been rejected by Medicaid because they contained improper "discharge-disposition" codes for the named patients. The claims were returned to Wise Management, and Sorensen placed them "on-hold" pending receipt of additional discharge information from Summa. When Kate Wise asked Sorensen why the claims had not been paid, Sorensen replied that she was waiting for Summa to provide her with information about the discharge status of the patients named in the four claims. Sorensen speculated that Wise showed a particular interest in these claims because one of them was worth in excess of $22,000 and Wise Management received a percentage of the total claim as compensation.
 {¶ 6} According to Sorensen, Wise instructed her to enter an "01" discharge disposition code for the four claims. The 01 code indicates a routine discharge where the patient is discharged to home or self-care. Sorensen questioned the use of this code because the amount of the $22,000 claim suggested to her that it was unlikely that the patient involved in that claim had been discharged to home care. She told Wise that they should wait for the information on the discharge status of the four individuals to come in from Summa. The stories diverge at this point, but Sorensen is entitled to have the facts construed to show that Wise became incensed at Sorensen's refusal to carry out her order and Wise ordered her to leave. Sorensen claims that she asked Wise directly whether she had been fired, but Wise did not respond.
 {¶ 7} Sorensen spent the rest of the day working at Wise Management. She spoke with other employees and told them what transpired, but did not tell the others that Wise had asked her to do something "illegal." She told them that Wise asked her to do something that was a violation of Summa's compliance training.
 {¶ 8} Sorensen spent the following day working at a Summa facility. When she returned to work at the Wise Management office, she had another confrontation with Kate Wise. Voices were raised and tempers flared as Wise accused Sorensen of being more faithful to Summa than to Wise Management. When Sorensen asked Wise if she was being fired, Wise responded by saying, "you need to get out of here."
 {¶ 9} Sorensen filed this action claiming that she had been terminated in violation of public policy when she refused to enter a discharge code that she believed to be incorrect. She also claimed that her discharge was against public policy on grounds that she had been asked to breach a contract between Wise and Summa.
 {¶ 10} The court gave Sorensen the benefit of the assumption that she had been terminated for failing to enter the discharge disposition code as ordered by Wise, even though she continued to work after that incident and was terminated after a heated argument with Wise two days later. Nevertheless, the court granted summary judgment to Wise Management because Sorensen failed to submit any evidence to show that her discharge violated a clear public policy because she admitted that she would have entered the discharge disposition codes ordered by Wise had she been instructed to do the same by Summa. Moreover, the court found that Sorensen failed to submit any evidence that her compliance with Wise's instructions would have violated any state or federal law. Finally, the court found that Sorensen submitted no evidence to show the existence of a contract between Wise and Summa.
 I {¶ 11} Sorensen's first complaint is that the court erred by granting summary judgment on her public policy claim because public policy should protect her from refusing to "blindly submit information to Medicaid that she reasonably believed to be false and inaccurate."
 {¶ 12} Most employment in Ohio is at-will, meaning that it can be terminated by either the employer or employee for any or no reason that is not contrary to law. Mers v. Dispatch Printing Co. (1985),19 Ohio St.3d 100, paragraph one of the syllabus. When employment is at-will, the employee cannot succeed on a claim of wrongful discharge. There is no dispute that Sorensen was an at-will employee of Wise Management.
 {¶ 13} There are exceptions to the at-will employment doctrine in cases in which public policy would be violated by the discharge. Greeleyv. Miami Valley Maintenance Contrs., Inc. (1990), 49 Ohio St.3d 228. InWiles v. Medina Auto Parts, 96 Ohio St.3d 240, 2002-Ohio-3994, the Ohio Supreme Court recently cited to Painter v. Graley (1994),70 Ohio St.3d 377, 384, for the elements necessary to establishing a claim that a discharge violates public policy:
 {¶ 14} "1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).
 {¶ 15} "2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).
 {¶ 16} "3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).
 {¶ 17} "4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element)." (Internal quotations and citations omitted.)
 {¶ 18} Wise's motion for summary judgment only addressed the first two elements of the public policy claim, so our discussion is limited to those two elements, both of which involve questions of law (the third and fourth elements are generally questions of fact). See Collins v. Rizkana (1995), 73 Ohio St.3d 65, 70.
 {¶ 19} We can agree that it is against the public policy to submit false or misleading information for the purpose of obtaining Medicaid benefits. R.C. 2913.40(B) makes it a felony under the facts of this case to "knowingly make or cause to be made a false or misleading statement or representation for use in obtaining reimbursement from the medical assistance program." Likewise, Title 42, U.S. Code Section 1320a-7b(a) provides criminal penalites for any person who "(1) knowingly and willfully makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal health care program (as defined in subsection (f)) or (2) at any time knowingly and willfully makes or causes to be made any false statement or representation of a material fact for use in determining rights to such benefit or payment." These citations are not exclusive, but representative of the public policy against the enormous amount of medicare fraud that takes place in this country. See Bowen Matthew, Tainted Prosecution of Tainted Claims: The Law, Economics, and Ethics of Fighting Medical Fraud Under the Civil False Claims Act (2001), 76 Ind.L.J. 525, 527 (noting that the General Accounting Office has found that ten percent of total health care costs are lost to fraudulent or abusive practices).
 {¶ 20} Health care fraud actions taken by the federal government in 2000:
 {¶ 21} "[w]on or negotiated more than $1.2 billion in judgments, settlements, and administrative impositions in health care fraud cases and proceedings. As a result of these activities, as well as prior year judgments, settlements, and administrative impositions, the federal government in 2000 collected $717 million. More than $577 million of the funds collected and disbursed in 2000 were returned to the Medicare Trust Fund. An additional $27 million was recovered as the federal share of Medicaid restitution." See Department of Health and Human Services and the Department of Justice Health Care Fraud and Abuse Control Program Annual Report For Fiscal Year 2000, found athttp://www.usdoj.gov/dag/pubdoc/hipaa00ar21.htm.
 {¶ 22} Hence, to the extent that a person like Sorensen is terminated for refusing orders to submit false information for the purpose of obtaining Medicaid, her discharge would be against public policy and would satisfy the first or "clarity" element of a wrongful discharge action.
 {¶ 23} The remaining question is whether Wise Management terminated Sorensen in violation of that public policy — the "jeopardy" element. This question necessarily turns on whether Wise Management "knowingly" ordered Sorensen to submit a false discharge disposition code to Medicaid.
 {¶ 24} Sorensen readily admits that she does not know for a fact whether the 01 code was incorrect under the circumstances. Her intuition, however, told her several things that led her to conclude that use of the code would be wrong: Wise had no patience with Summa's new discharge disposition practices and training procedures (which allegedly cost Wise Management money); Wise probably did not know the discharge status of the patients involved in the four claims; Wise most likely used the discharge disposition code best calculated to let her collect the accounts quickly in order to obtain the commission; Wise had never before told Sorensen which discharge disposition code to use; and the amount of some of the bills suggested to her that the medical conditions of those involved made it highly unlikely that they were discharged without any restrictions in accordance with the 01 code. Putting these observations together led Sorensen to conclude that Wise picked the 01 discharge code solely in order to obtain a quick payment on long-outstanding accounts.
 {¶ 25} None of this intuition rose to the level of fact sufficient to defeat summary judgment. A case of Medicaid fraud requires that the offender "knowingly" make or cause to be made a false statement. Sorensen had suspicions that the discharge disposition codes ordered by Wise were incorrect, but she could not say so with certainty. In fact, she conceded to Wise at the time of their altercation that she would use the 01 code if Summa responded to her inquiry by telling her to use that code. Sorensen may have thought the billing codes were wrong, but she did not know for a fact that they were not right. This is not the kind of situation where it can be said that Sorensen would have been ordered to do that which would have been illegal.
 {¶ 26} Our conclusion is buttressed by Wise Management's expert. The expert filed a report in which she gave the following opinion:
 {¶ 27} "It is not fraudulent or illegal to translate Medicare status indicators 08, 50, and 51 [the indicators originally assigned to Sorensen's accounts] to the Medicaid status indicator of 01. It would not be considered illegal or fraudulent for the owner of a medical billing company with expertise in Medicaid billing to direct or instruct an employee to make this change. Based on the resources that Ms. Sorensen had available to her, it is not reasonable to conclude that this was fraudulent to change the Medicare status indicators of 08, 50 and 51 to the Medicaid status indicator of 01 on the four claims forms which are the subject of her lawsuit."
 {¶ 28} Sorensen did not counter with any expert opinion of her own, nor did her evidence contradict the expert's opinion. Indeed, in her deposition, Sorensen admitted that she never did learn whether the 01 discharge disposition code was incorrect, so it follows that she has no factual basis for saying that it would have been illegal for her to enter the codes as ordered by Wise.
 {¶ 29} The parties spend a great deal of time discussing the applicability of Klontz v. City of London, Madison App. No. CA2001-08-019, 2002-Ohio-1605, but we are not convinced that the case pertains in quite the way the parties believe. Klontz was a building, electrical inspector and zoning inspector. Just two days after having been informed that the mayor might take away his zoning inspector duties (along with a corresponding reduction in pay), Klontz was asked to inspect an electrical socket used in a street lighting panel. Klontz refused to sign off on the inspection, however, because he did not believe he was qualified to inspect the socket. The electrical workers called the London's street supervisor to the work site, and the street supervisor signed off on the wiring over Klontz's very strong objections. Klontz then informed the mayor that he had confirmed with the state Board of Building Standards that he had "no jurisdiction" over the street lighting project. That same evening, the city council noted Klontz's lack of popularity with other city officials, builders and citizens and unanimously voted to order the mayor to terminate Klontz. The mayor terminated Klontz the following day. Klontz brought a wrongful termination suit against the city, claiming that he had been discharged in violation of public policy for failing to sign off on the wiring of the street lighting project, even though he lacked jurisdiction over the project.
 {¶ 30} The court of appeals found that Klontz could not prevail on his public policy claim because he did not list the specific provisions of the electrical code that he would have violated had he signed off on the street lighting project. The court of appeals held:
 {¶ 31} "However, without knowing the specific provisions of the codes that Klontz would have violated had he approved of the project, it is impossible to determine if Klontz's refusal amounted to anything more than Klontz's desire to `engage in another inspection "by the book"[,]' as Klontz himself characterizes it. We are unable to assess whether discharging an employee for refusing to sign off on a project that would violate unspecified provisions of Ohio's Basic Building Code or the National Electric Code violates a clear public policy of this state, which is of equally serious import as the violation of a statute. Accordingly, the trial court did not err in determining as a matter of law that Klontz's discharge did not violate a clear public policy." (Internal citation omitted.)
 {¶ 32} While we agree with the court of appeals' reasoning that a person seeking to apply the public policy exception to the at-will employment doctrine must state with specificity the law or policy that would have been violated by the refusal to perform an employment action, we must point out that nowhere in the opinion does it say that Klontz was terminated for refusing to sign off on the street lighting project. The facts detailed in the opinion show that the mayor had raised the subject of relieving Klontz of his zoning inspector duties at the city council meeting, but apparently did not propose terminating him. The mayor did appear to detail what transpired at the street lighting project job site earlier that day, but city council went beyond that incident. Several council members noted they had received complaints from their constituents about Klontz's behavior. The court of appeals opinion also details conduct prior to Klontz's refusal to sign off on the lighting project, for example noting that Klontz had ordered the mayor to remove two junked cars from his property and that the mayor and other city officials received complaints from citizens and builders about his conduct and demeanor, including some women who claimed that Klontz made "inappropriate sexual remarks" to them.
 {¶ 33} On balance, these facts do not give us the confidence to say that Klontz's discharge stemmed entirely from his refusal to sign off on the lighting project. It is true that he did refuse to sign off on the lighting project, but mainly, the facts contained in the opinion tend to show, at least to us, that he had been discharged for other reasons. Therefore, we hesitate to consider Klontz's authority on the subject of the public policy exception to the at-will employment doctrine.
 {¶ 34} In summary, we find that Sorensen failed to present any facts to show that she had been ordered to perform an illegal act; therefore, her discharge would not fall within the public policy exception to the at-will employment doctrine because she could not establish the jeopardy element of the claim. The court did not err by granting summary judgment on the first count of the complaint.
 II {¶ 35} Sorensen next argues that the court erred by granting summary judgment because it is against the public policy to terminate an employee for refusing to breach a contract. She submitted evidence to show that Summa established procedures for submitting Medicaid claims and that Wise's order to enter what Sorensen believed were incorrect discharge codes would have violated Wise's agreement with Summa. In support of this argument, Sorensen cites to Vitale v. Modern Tool Die (June 22, 2000), Cuyahoga App. No. 76247, as authority for the proposition that the public policy precludes firing an employee for refusing to breach a contract.
 {¶ 36} In Vitale, a terminated employee filed a wrongful discharge suit against his employer and claimed that he had been terminated for refusing to fabricate shop rules violations charges against union employees. We held that the "discharge of the supervisor for refusing to interfere with or breach the collective bargaining agreement is against the public policy established by common law."
 {¶ 37} Regardless of what Vitale holds, there is no evidence to establish that Wise had a contract with Summa. Kate Wise submitted an unrebutted affidavit claiming that there was no contract at the time of Sorensen's termination. Sorensen admits that she is unable to establish the existence of a contract between Wise Management and Summa. Absent the existence of any contractual relationship between Wise Management and Summa, Sorensen's public policy argument based on a contract must fail.
 {¶ 38} And even if Sorensen had established the existence of a contract, she would not have been in a position to use it as a basis for justifying her refusal to enter the discharge codes as ordered. We noted in Vitale that Vitale had been terminated for refusing to fabricate violations of shop rules against union employees. This, we found, would have been a violation of the Labor Management Relations Act, Title 29 U.S. Code Section 158(a). As we earlier noted, no such illegal activity would have taken place if Sorensen had carried out Wise's order because there was no evidence that the discharge codes Wise wanted Sorensen to use were incorrect. In short, Sorensen is claiming that Wise ordered her to violate a non-existent contract in a way that would not have been a violation at all. This is not the stuff of a public policy exception to a wrongful discharge claim.
 {¶ 39} Finally, Sorensen's rationale that she can complain about being ordered to breach her employer's contract with Summa is open to question. Assuming for the sake of argument that a contract did exist between Wise Management and Summa, it would not be criminal or even wrong for Wise Management to breach the contract. This rather elementary principle is best exemplified by the unavailability of punitive damages for a breach of contract. A party to a contract is at liberty to breach that contract, being liable only for damages proximately resulting from the breach. In Applied Equip. Corp. v. Litton Saudi Arabi (1994),7 Cal.4th 503, 516, the California Supreme Court stated:
 {¶ 40} "But the law generally does not distinguish between good and bad motives for breaching a contract. `[I]n traditional contract law, the motive of the breaching party generally has no bearing on the scope of damages that the injured party may recover for the breach of the implied covenant [of good faith and fair dealing]; the remedies are limited to contract damages.' `Varying personal or economic reasons motivate one to breach his contract, but the general rule is that . . . motives . . . are immaterial and cannot be inquired into on the question of compensatory damages.'" (Emphasis sic.) (Internal citations omitted.)
 {¶ 41} Again, supposing that there was a contract, Wise would have had every right to breach the contract since she would have been a party to it. Sorensen may have had moral qualms about entering discharge codes that she believed were wrong, and it is not our intention to belittle her for holding that belief. Nevertheless, she could not breach a contract that she was not a party to. That would have been Wise's decision alone and we assume that Wise would have been ready to accept the full consequences of such an action had it occurred.
 {¶ 42} The court did not err by granting summary judgment on the claim that it would have been a violation of public policy to force Sorensen to breach a non-existent contract to which she would not have been a party.
 III {¶ 43} Finally, Sorensen argues the court erred to the extent it granted summary judgment on her claim of wrongful discharge in violation of public policy because she did not report her employer's misconduct. The court found that Sorensen failed to exhaust her administrative remedies because she did not report the allegedly fraudulent conduct as mandated by her training with Summa.
 {¶ 44} Our finding that Sorensen submitted no evidence to show that Wise Management was engaging in fraudulent activity necessarily moots this argument, as there would have been no need for her to report non-fraudulent conduct by Wise Management. We therefore have no reason to consider this argument.
Judgment affirmed.
It is ordered that appellees recover of appellant their costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
KENNETH A. ROCCO, A.J., and FRANK D. CELEBREZZE, JR., J., CONCUR.