OPINION
{¶ 1} On May 6, 2004, Loyd D. Garrett ("Garrett") filed an appeal from a judgment of the Montgomery County Court of Common Pleas, which granted summary judgment in favor of his former employer, The Dayton Power 
Light Company ("DPL"), on various claims related to the termination of his employment. Garrett died in September 2004, and his wife, Lisa Garrett, subsequently filed a motion for substitution of parties pursuant to App.R. 29(A). As a procedural matter, we first must address the motion for substitution.
 {¶ 2} Loyd Garret died while his appeal was pending, three days before oral argument. The parties proceeded with oral argument with the understanding that a substitution of parties would be necessary. On November 4, 2004, Lisa Garrett filed a motion for substitution, to which she attached an entry from the Probate Court of Brown County appointing her to serve as the Administratrix of Garrett's estate. DPL filed a memorandum in opposition to the motion for substitution in which it asserted that Garrett's claims did not survive his death. DPL did not move to dismiss the appeal.
 {¶ 3} App.R. 29(A) unequivocally provides that, if a party dies while an appeal is pending, "the personal representative of the deceased party may be substituted as a party on motion filed by the representative * * *." Accordingly, we will grant Lisa Garrett's motion for substitution. DPL challenged the survivability of the claim in response to the motion for substitution. However, survival of the claim and substitution of the parties are distinct issues and, in the absence of motion to dismiss, we are of the view that the survival of the claims is not properly before this court.
 {¶ 4} We now turn to the merit of the appeal.
 {¶ 5} From 1971 until 2001, Garrett worked at the J.M. Stuart Generating Station ("the Stuart Station") in Aberdeen, Ohio, which is operated by DPL. On January 19, 2001, Garrett was employed as an Operations Supervisor when he was attacked by a DPL employee, Jack Dwelly. According to Garrett, Dwelly was trying to finish a project so that he could leave for the day, and he had requested Garrett's help. Garrett indicated that he would help in a minute, as soon as he was finished with what he was doing. Dwelly became extremely frustrated with the delay and began to curse at Garrett. In an effort to settle Dwelly down, Garrett continually followed Dwelly when he attempted to walk away from Garrett. When Garrett put his hand on Dwelly's arm, Dwelly punched Garrett several times in the head and ribs, knocking him to the ground. Dwelly then threatened that if Garrett reported the incident and caused trouble for Dwelly, he would give Garrett "a real good thumping."
 {¶ 6} Dwelly admitted hitting Garrett, but his version of the events leading to the attack was somewhat different. According to Dwelly, Garrett kept him waiting about fifteen minutes after he had asked for help and then approached him with a condescending manner. Dwelly walked away, but Garrett followed and grabbed his shoulder. Dwelly knocked Garrett's arm away, told Garrett not to touch him, and tried to walk away again. Garrett followed again, and Dwelly punched him.
 {¶ 7} Dwelly was fired as a result of this altercation, and Garrett was suspended for two weeks and ordered to attend anger management training. Dwelly's union filed a grievance on his behalf, and the matter went to arbitration. The arbitrator concluded that both men were at fault and that their punishments should be comparable. As such, the arbitrator ordered that Dwelly be reinstated but that he be suspended for two weeks and required to complete anger management training.
 {¶ 8} Garrett was unable to return to work after his two week suspension. He was diagnosed with post-traumatic stress disorder and went on short term disability leave for six months. During this period, the company encouraged him to return to work and discussed with him the conditions under which he thought he would be able to return. Garrett expressed a high degree of anxiety about having any interaction with Dwelly on the job, and his anxiety extended to how he would be treated by other union members as well. By the time Garrett's short term disability benefits came to an end, his post-traumatic stress disorder had resolved and he had been cleared by his doctors to return to work. Nonetheless, he applied for long term disability. Long term disability was denied, yet Garrett still refused to return to work, whereupon he was fired in August 2001.
 {¶ 9} In January 2002, Garrett filed a complaint against DPL asserting claims for negligent retention, negligent supervision, a "public policy tort," ratification of an intentional tort, and constructive discharge. DPL sought summary judgment on all of these claims. Garrett subsequently abandoned his negligent retention, negligent supervision, and ratification of an intentional tort claims. In April 2004, the trial court granted summary judgment in favor of DPL on the public policy tort and constructive discharge claims.
 {¶ 10} Garrett raises two assignments of error on appeal.
I. "The trial court erred in finding that there was no clear public policy that was jeopardized by DPL'S termination of Garrett's employment."
 {¶ 11} To establish a cause of action for wrongful discharge in violation of public policy, a plaintiff must show that a clear public policy existed and that dismissing employees under circumstances like those involved in the plaintiff's case would jeopardize that public policy. Collins v. Rizkana (1995), 73 Ohio St.3d 65, 69-70, 1995-Ohio-135,652 N.E.2d 653. The parties agree that Ohio has a public policy requiring employers to provide employees with a safe work environment. They disagree, however, about the degree of workplace safety required pursuant to this public policy. DPL contends, and the trial court found, that Garrett expected DPL to provide for his safety at a level beyond that required by public policy in that he expected a virtual guarantee of safety. Garrett claims that he "merely wanted to be assured `within reason' that no harm would befall him."
 {¶ 12} Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. State ex rel. Grady v. State Emp. Relations Bd.,78 Ohio St.3d 181, 183, 1997-Ohio-221, 677 N.E.2d 343; Harless v. WillisDay Warehousing Co. (1978), 54 Ohio St.2d 64, 66, 375 N.E.2d 46. The moving party "bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims." Dresher v. Burt
(1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264. If the moving party satisfies its initial burden, "the nonmoving party then has a reciprocal burden * * * to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." Id.; see Civ.R. 56(E).
 {¶ 13} The existence of a public policy in Ohio favoring workplace safety is not in dispute. See Pytlinski v. Brocar Products., Inc.,94 Ohio St.3d 77, 79-80, 2002-Ohio-66, 760 N.E.2d 385; Blair v. Honda ofAmerica Mfg., Inc., Union App. No. 14-01-33, 2002-Ohio-1065.
 {¶ 14} More specifically, it is our judgment that public policy requires employers to provide a reasonable and adequate degree of workplace safety. As such, we will address whether there was genuine issue of material fact as to whether DPL offered a reasonable and adequate degree of workplace safety to Garrett upon his return from being attacked by Dwelly. Garrett claims that DPL forced him to choose between his safety and his job, and that being confronted with such a choice violates public policy. The trial court concluded that there was no genuine issue of material fact as to whether public policy was violated by Garrett's termination.
 {¶ 15} In its motion for summary judgment, DPL presented extensive evidence of the type permitted by Civ.R. 56(C) that Garrett had refused to return to the Stuart Station unless DPL guaranteed his safety and that DPL had been unable to provide a guarantee. Garrett claims in his brief that, although he had used the term "guarantee" in his discussions with DPL personnel, taken in context it was clear that he "merely wanted to be assured `within reason' that no harm would befall him."
 {¶ 16} We disagree with Garrett's characterization of the evidence. Garrett's deposition, taken as a whole, established that he was willing to return to work under only two circumstances: 1) he was given a position at an entirely different facility, or 2) he was guaranteed no contact with Dwelly at the Stuart Station. Garrett's own deposition made clear that he was unwilling to return to work at the Stuart Station if there was any possibility that he would come in contact with Dwelly there. Garrett may not have framed his demand as a guarantee of safety, but there is no question that he demanded a guarantee of no contact with Dwelly whatsoever.
 {¶ 17} DPL employees testified in depositions that they had inquired about the availability of positions within DPL's other power plant operations and had been unable to find a position for Garrett at a different station. They also made clear that a number of factors, including DPL's compact with Dwelly's union, prevented the type of scheduling arrangements that would have eliminated all possibility of contact between the men. Dwelly's position involved regular overtime work (for overtime pay) and availability for emergency calls. It appears that these factors would have made it impossible or, at the very least, extremely cumbersome, to craft a schedule which would have guaranteed that Dwelly and Garrett would never be at the plant at the same time. Garrett even conceded that DPL could not bar Dwelly from overtime and emergency work without his consent because of the union contract. Furthermore, DPL employees stated that contact could not have been avoided even if Garrett had been willing to return in a lower level position. DPL offered to minimize Garrett's contact with Dwelly as much as possible, but it could not assure that the two men would never be in the building at the same time. By Garrett's own admission, their contact with one another had been limited to only about 10 percent of the time even prior to the attack.
 {¶ 18} DPL employees further testified or stated by affidavit that they had impressed upon Dwelly the seriousness of his conduct. They had attempted to fire him in this instance, and he was informed that further misconduct would result in his termination. He had also been required to attend anger management training.
 {¶ 19} Garrett asserted that employees brought weapons to work, but he acknowledged that he and other supervisors had dealt with such conduct in the past and that it violated company policy to bring a weapon to the workplace. He did not offer any evidence of Dwelly carrying a weapon. There was also no evidence of a widespread problem or concern about weapons at DPL.
 {¶ 20} Based on the evidence presented, and construing this evidence in the light most favorable to Garrett, the trial court properly concluded that there was no genuine issue of material fact as to whether Garrett's termination had violated public policy. Ohio public policy undoubtedly favors workplace safety. It does not, however, require employers to cater to the exaggerated fears of their employees. We do not question the debilitating nature of Garrett's fear, but the evidence did not create a genuine issue of material fact that his fear was rationally related to the risk presented by his return to the workplace. The reasonable measures taken by DPL, including stern warnings to Dwelly and a willingness to minimize contact between the men through scheduling, were unacceptable to Garrett. Although he claims that he did not require a guarantee of safety per se, he did demand a guarantee that he would never cross paths with Dwelly at Stuart Station. This was a demand that went beyond reasonable assurances of safety and which DPL was simply unable to accommodate for contractual and practical reasons. Thus, there was no genuine issue of material fact that Garrett's termination was rooted in a public policy violation; rather, it was rooted in his demand for an unreasonable accommodation. The trial court did not err in granting summary judgment to DPL on this issue.
 {¶ 21} The first assignment of error is overruled.
 {¶ 22} "Issues of fact preclude summary judgment on plaintiff's constructive discharge claim."
 {¶ 23} Garrett claims that DPL's actions "made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign."
 {¶ 24} As we discussed under the first assignment of error, there was no genuine issue of material fact as to whether DPL made reasonable efforts to accommodate Garrett's return to work after his attack. DPL encouraged Garrett to return to work and discussed with him the conditions under which he thought he would be able to return. DPL explored the possibility of accommodating Garrett's terms but was unable to do so. Moreover, the risk perceived by Garrett is not supported by objective evidence of danger to him or others in the workplace. As such, the trial court properly concluded that there was no genuine issue of material fact as to whether a reasonable person in Garrett's position would have found conditions at Stuart Station intolerable.
 {¶ 25} The second assignment of error is overruled.
 {¶ 26} The judgment of the trial court will be affirmed.
Grady, J. and Young, J., concur.
(Hon. Frederick N. Young sitting by assignment of the Chief Justice of the Supreme Court of Ohio).