OPINION
{¶ 1} Appellants, Deborah and Glen Feichtner, appeal summary judgments of the Wyandot County Court of Common Pleas in favor of appellee, Kalmbach Feeds (hereinafter "Kalmbach") on a matter of alleged wrongful termination and a denial of insurance benefits involving both appellants.
 {¶ 2} Deborah Feichtner began employment at Kalmbach in January 1999 as a grain accounting clerk. Her job duties included pricing grain, weighing trucks before and after delivery, and testing grain for moisture and fine material. As part of her compensation package, Kalmbach provided health insurance coverage for her, and at an additional price, also provided health insurance coverage for her husband, Glen, which the Feichtners elected to purchase.
 {¶ 3} After approximately three months at Kalmbach, Deborah became aware that her job performance was below satisfactory. Namely, Kalmbach informed her that she needed to (1) know more about the Chicago Board of Trades; (2) learn which customers received discounts and which customers did not; and (3) hone her job skills in order to perform them in a more efficient and quicker manner. Kalmbach's upper management informally met with her to discuss her actual job performance versus what the company expected out of the position. Deborah agreed that her performance was below company's expectations. Subsequently, Deborah began taking classes to better understand the Chicago Board of Trades, but, according to Kalmbach and herself, she still had a sub-par understanding of the system. Finally, in September, 1999, Kalmbach received a Food and Drug Administration report alleging problems in Kalmbach grain testing, which Deborah denied responsibility for the specific problems alleged in the report.[1]
 {¶ 4} On September 16, 1999 Glen seriously injured his right arm while tending to his farm. As a result, the Feichtners incurred over $62,000 in medical expenses. It is not disputed that Glen was an insured under Deborah's health insurance plan through Kalmbach. Nevertheless, when the Feichtners submitted the medical bills to the third party administrator, Berwanger Overmyer Associates (hereinafter "BOA"), BOA denied coverage on November 22, 1999 stating that (1) the injury is expressly excluded because it was "occupational" and (2) that the appropriate claim should be presented to workers compensation.
 {¶ 5} After her husband's injury, Deborah took some time off work to tend to him. When she returned to Kalmbach, her work was still allegedly below average. Consequently, Deborah received her first formal discipline letter on October 19, 1999, which outlined her work performance deficiencies. Deborah received a second formal discipline letter on November 3, 1999, which stated that her work performance had not improved since the October report. Two formal meetings followed on November 22 and December 9, 1999. Deborah was subsequently terminated on December 16, 1999.
 {¶ 6} The Feichtners filed suit in the Wyandot County Common Pleas Court on September 16, 2002 challenging (1) the denial of Glen's health insurance benefits arising out of his September 16, 1999 injury and (2) Deborah's wrongful termination. The trial court ultimately granted summary judgment on both claims, and the Feichtners appeal alleging four assignments of error. Assignments of error one through three will be considered together because they concern the extent of Glen's health insurance coverage; assignment of error four will be addressed separately because it alleges Deborah was wrongfully terminated.
 Standard of Review {¶ 7} The standard for review of a grant of summary judgment is one of de novo review. Lorain Nat'l Bank v. Saratoga Apts.
(1989), 61 Ohio App.3d 127, 129, 572 N.E.2d 198. Thus, such a grant will be affirmed only where there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). In addition, "summary judgment shall not be rendered unless it appears that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence construed most strongly in his favor." Id.
 {¶ 8} The moving party may make his motion for summary judgment in his favor "with or without supporting affidavits[.]" CivR. 56(B). However, "[a] party seeking summary judgment must specifically delineate the basis upon which summary judgment is sought in order to allow the opposing party a meaningful opportunity to respond." Mitseff v. Wheeler (1988),38 Ohio St.3d 112, 526 N.E.2d 798, syllabus. Summary judgment should be granted with caution, with a court construing all evidence and deciding any doubt in favor of the nonmovant. Murphy v.Reynoldsburg (1992), 65 Ohio St.3d 356, 360, 604 N.E.2d 138. Once the moving party demonstrates that he is entitled to summary judgment, the burden then shifts to the non-moving party to show why summary judgment in favor of the moving party should not be had. See Civ.R. 56(E). In fact, "[i]f he does not so respond, summary judgment, if appropriate, shall be rendered against him."Id.
 Insurance Coverage First Assignment of Error THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT WHEN AGENUINE ISSUE OF MATERIAL FACT EXISTED AS TO WHETHER SUMMARYJUDGMENT CAN BE GRANTED BASED ON A CONTRACT THAT IS NOT INEVIDENCE.
 {¶ 9} In this assignment of error, the Feichtners allege that (1) Kalmbach failed to introduce the actual insurance contract into question; therefore, the trial court erred in relying on the summary plan the defendant introduced, and (2) the contract's coverage expired on December 31, 1998, which was one year before Glen Feichtner's arm injury.
 {¶ 10} In this case, Kalmbach moved for summary judgment and attached a two-page "plan," which was apparently a summary of the entire insurance agreement. The Feichtners objected, and, as a result, Kalmbach attached a forty-nine page summary plan. In response, the Feichtners did not proffer any alternative or make any effort to further discover an original contract. In the appeal, the Feichtners now object to the trial court's use of Kalmbach's summary plan as the basis for the contract coverage language at issue. Moreover, the Feichtners contend that the original contract, not the summary plan (i.e. a summation of the major terms of the health insurance policy) is controlling. Nevertheless, the Feichtners do not point to any evidence supporting an allegation that Kalmbach's summary plan is not an accurate portrayal of the coverage language. Furthermore, the Feichtners had ample opportunity prior to the summary judgment ruling to obtain and introduce the original contract, or relevant portions, into evidence if the original contract was needed to support their case and did not do so. Under these circumstances, the Court will not presume the policy language relied on by the trial court was inaccurate.
 {¶ 11} The Feichtners cite Douglas v. Salem CommunityHospital (2003), 153 Ohio App.3d 350, 2003-Ohio-4006, for its conclusion that "[u]nauthenticated documents which are not sworn, certified, or authenticated by way of affidavit have no evidentiary value and may not be considered by the trial court in ruling on a motion for summary judgment." While we may agree with this legal rule, we conclude that it has no bearing on the case at bar because Debra Christy, Kalmbach's Human Resource Manager, authenticated the summary plan in a supplemental affidavit. Because supplemental affidavits are a permissible tool to support a motion for summary judgment, see Civ.R. 56(E), Christy's affidavit does give the trial court evidentiary support to rule in Kalmbach's favor.
 {¶ 12} Next, the Feichtners argue that the summary plan on which the trial court relied was outdated because the specific language in the plan stated that the effective date was January 1, 1998, and the plan year ended December 31, 1998.
 {¶ 13} The summary plan states that a "[p]lan year is the 12-month period beginning on either the effective date of the plan or on the day following the end of the first Plan Year which is a short plan year." Plan Summary at p. 27. Simply put, the plan summary states that the plan year ends, not that the planends, on December 31, 1998. Furthermore, Christy's affidavit details that the language in the summary plan introduced into evidence was the contract's controlling language at the time Glen was injured and when the Feichtners were attempting to receive coverage. Finally, the Feichtners, in their argument contra to Kalmbach's motion for summary judgment, relied on the language in the summary plan without raising any issues as to a possible discrepancy that might exist in their favor between a new, appropriately dated plan and the plan that was introduced into evidence. Taken all these factors together, we conclude that the Feichtners have not raised a genuine issue of material fact regarding the relevant terms of the insurance plan and, therefore, their argument regarding the contract dates is without merit. Thus, the first assignment of error is overruled.
 Second and Third Assignments of Error THE COURT ERRED IN GRANTING SUMMARY JUDGMENT BECAUSE KALMBACHFAILED TO DETERMINE COVERAGE FOR MR. FEICHTNER AS REQUIRED BYTHE CONTRACT.
 THE COURT ERRED IN GRANTING SUMMARY JUDGMENT WHEN A GENUINEISSUE OF MATERIAL FACT EXISTED AS TO WHETHER THE INJURIESSUFFERED WERE EXCLUDED OR AS A MATTER OF LAW EXCLUDABLE.
 {¶ 14} In these consolidated assignments of error, the Feichtners contend that (1) genuine issues of material fact exist as to whether Glen's injury falls within the insurance plan's exclusion, and (2) Glen never received a final review from Kalmbach after BOA denied his claim, which is required in the Administrative Services Agreement between Kalmbach and BOA. As a threshold matter, we must first decide whether Glen's injury does, in fact, fall within the express claim exclusion language because if the injury is excluded, then there is no need to decide whether the final decision to resolve this dispute is Kalmbach's responsibility.
 {¶ 15} The insurance coverage that Glen purchased through Kalmbach expressly describes certain types of injuries that were excluded from coverage. Namely, the exclusion at issue states:
(26) Occupational. Care and treatment of an Injury or Sicknessthat is occupational — that is, arises from work for wage orprofit including self-employment.
 {¶ 16} In the case sub judice, the Feichtners argue that this language is ambiguous; therefore, the exclusion should be construed in their favor as the insured. Furthermore, they claim that Glen's farming job was not within the intended coverage of the exclusion because when Christy learned of BOA's denial of coverage, she was "shocked." We find these arguments unpersuasive.
 {¶ 17} The specific and clear language of the occupation exclusion, supra, states that insurance coverage will not be provided for care or treatment for injuries that arises from work for profit, which may include self-employment. In the instant case, Glen's farming activity falls squarely within this explicit exclusion.
 {¶ 18} In Deborah Feichtner's deposition, she stated:
Q. Did [Glen Feichtner] generate income from [farming]?
 A. Income for profit or just —
 Q. Yes. Did [Glen] generate income or declare that income withthe federal government —
 A. Yes.
 Q. — on a tax return, I assume?
 A. Yes.
* * *
Q. He would have included any income that was generated fromhis farming activities as his personal income on his tax return?
 A. Yes.
Deposition of Deborah Feichtner, pp. 49-50.
 {¶ 19} The Feichtners suggest that Glen's farming activity was a hobby instead of a job or self-employment. We conclude that this argument is irrelevant to the specific exclusion language stated in the insurance agreement.
 {¶ 20} The insurance agreement does not depend upon whether one was involved in a self-employed activity. To the contrary, the plain and unambiguous language states that any injury resulting from work for profit, including self-employment, is excluded from coverage. We find, therefore, that viewing the facts more favorable to the Feichtners, Glen, in fact, did file an income tax statement because he received profit from his farming activity. Furthermore, we need not get involved in the determination as to whether farming was Glen's hobby or his job, even though the record suggests that Glen's farming activities may be self-employment. The mere fact that he was injured out of an activity that he engages in for profit places him within the insurance contract's definition of the "occupational" exclusion. Thus, no genuine issues of material fact exist as to the extent of the exclusion coverage.
 {¶ 21} Since we conclude that the plain language of the "occupational" exclusion includes Glen's injury, we need not address the issue of whether Kalmbach holds the final authority over the decision to grant to exclude coverage. The second and third assignments of error are overruled.
 Fourth Assignment of Error THE TRIAL COURT ERRED IN ENTER[ING] SUMMARY JUDGMENT AGAINSTMRS. FEICHTNER WHERE THE EVIDENCE CREATED A QUESTION OF FACT ASTO WHETHER HER TERMINATION WAS PRETEXTUAL AND AGAINST PUBLICPOLICY.
 {¶ 22} In this assignment of error, the Feichtners allege that Deborah's termination was a wrongful discharge in violation of public policy. Specifically, the Feichtners allege that Deborah was terminated because she challenged BOA's denial of Glen's insurance coverage and discussed all of the related events with other employees. Furthermore, Deborah alleges that genuine issues exist as to whether a Food and Drug Administration Report was a legitimate reason for her termination. On the other hand, Kalmbach contends that Deborah was terminated because of poor job performance.
 {¶ 23} At the outset, it should be noted that Deborah's employment with Kalmbach was an "at will" employment relationship; therefore, an employer may terminate an "at will" employee at any time unless the termination is against public policy or a statute. Collins v. Rizkana (1995),73 Ohio St.3d 65, 69, 652 N.E.2d 653. In order to establish a claim for wrongful termination in violation of public policy, the plaintiff must show:
(1) That [a] clear public policy existed and was manifested ina state or federal constitution, statute, or administrativeregulation, or in the common law (the clarity element).
 (2) That dismissing employees under circumstances like thoseinvolved in the plaintiff's dismissal would jeopardize the publicpolicy (the jeopardy element).
 (3) That plaintiff's dismissal was motivated by conductrelated to the public policy (the causation element).
 (4) The employer lacked overriding legitimate businessjustification for the dismissal (the overriding justificationelement).
 Collins, 73 Ohio St.3d at 69-70 (citing H. Perritt, TheFuture of Wrongful Dismissal Claims: Where Does the Employer SelfInterest Lie? (1989), 58 U.Cin.L.Rev. 397, 398-399.).
 {¶ 24} The determinations of the extent of the clarity and jeopardy elements in a particular case are questions of law to be decided by the court. Id. Contrarily, "[t]he jury decides factual issues relating to causation and overriding justification." Collins, 73 Ohio St.3d at 70 (citing H. Perritt, The Future of Wrongful Dismissal Claims: Where DoesEmployer Self-Interest Lie?, supra, at 401).
 {¶ 25} Deborah received her first informal notice that her work was below average after only three months on the job. Deposition of Deborah Feichtner at p. 94. In that April 1999 meeting, Deborah was informed of her three weak areas that she needed to improve — learning more about the Chicago Board of Trade, understanding which customers get discounts, and accomplishing tasks in a timelier manner. Id. at 95-97. Furthermore, in September, 1999, Kalmbach received a Food and Drug Administration report concluding that the company was deficient in its grain testing and sampling, which was Deborah's responsibility.
 {¶ 26} These informal complaints about Deborah's work performance were not resolved, so Deborah received a formal discipline letter on October 19, 1999. Similarly, Deborah received a second formal discipline letter on November 3, 1999, which outlined the same three job performance deficiencies outlined in the April meeting. Moreover, Deborah admitted in a deposition that she was terminated because she could not meet Kalmbach's expectations. The record states:
Q. You allege in paragraph 9 [of the complaint] that as aresult of these actions, the defendant, Kalmbach, wrongfullyterminated [your] employment. Can you tell me why you believethat your employment was wrongfully terminated by Kalmbachfeeds?
 A. I was not given — I just believe I was not given the propertraining with Barb's expectations. I could not meet herexpectations.
Deposition of Deborah Feichtner at p 68.
 {¶ 27} Finally, and perhaps most importantly, Deborah admits that her one informal and two formal discipline letters were received prior to BOA's notification that it was denying Glen's insurance coverage request. Deborah stated in her deposition:
Q. Okay. So let me make sure I'm understanding this correctly.You believe you were wrongfully terminated because you wereunable to meet Barb's expectations that you thought wereunreasonable?
 A. Uh-huh. And I started talking to other employees about theinsurance plan, if they read their exclusions, and some of theother employees were raising issues on the plan on the exclusions[sic] also and —
 Q. You believe that had something to do with you termination?
 A. Uh-huh.
 Q. Do you also believe that the two written and several verbaldeficiency warnings to you had something to do with thetermination of your employment?
 A. Yes.
 Q. Do you recall having a conversation with somebody atKalmbach Feeds where you indicated if it doesn't look like it'sgoing to work out for me here, I would just rather get it overwith and be terminated?
 A. That wasn't the exact words.
* * *
Q. Why don't we do it a different way and tell me what youremember about that.
 A. I told them if I'm not doing any better, why am I wastingyour time and my time?
 Q. Okay. And that conversation and the two written warningsthat we have gone over today took place before BOA denied yourhusband's claim for benefits, correct?
 A. Uh-huh.
Id. at 68-70.
 {¶ 28} Viewing the facts most favorable to the Feichtners, we conclude that reasonable minds could not differ as to the legitimate reason why Kalmbach terminated her employment. First, Deborah admits she was doing a sub-par job. Second, she recognizes that she received her two formal discipline letters before BOA denied her husband's claim and before she began complaining to other employees, i.e. all of the informal discipline conversations and the receipt of the two formal discipline letters occurred before the events that she alleges lead to her wrongful dismissal. Third, Deborah directly asked Kalmbach officials to terminate her if she was not doing any better. Specifically, Deborah's termination letter states, "[t]his decision was reached with your request in mind of not wasting either party's time or effort if the performance was not improving." Finally, Deborah's wrongful termination is an allegation that is not supported by any facts on the record except for her own affidavit and deposition suggesting that she was terminated because she was talking to others about her husband's insurance denial. See Civ.R. 56 (E).
 {¶ 29} Upon review, it is our determination that reasonable minds could not differ in concluding that Kalmbach had legitimate reasons outside the realm of public policy to terminate Deborah's employment "at will." Thus, even assuming arguendo that the clarity and jeopardy prongs of Collins are met, the Feichtners' argument ultimately fails to meet the last two elements. In sum, even viewing the facts most favorable to Deborah, it is apparent that her dismissal was motivated by conduct unrelated to public policy and, most importantly, that Kalmbach had legitimate business justification for the dismissal. Accordingly, the fourth assignment of error is overruled.
Judgment Affirmed.
 Cupp and Bryant, J.J., concur.
[1] Deborah alleges that the FDA report had nothing to do with her job responsibility; however, a Kalmbach internal memorandum from the Vice-President of Operations to Christy states that the medication sampling and testing, which was the subject of the FDA inspection, was Deborah's responsibility, and that she was deficient in her duties.