[This opinion has been published in *Ohio Official Reports* at 73 Ohio St.3d 65.]

COLLINS, APPELLANT, *v*. RIZKANA, APPELLEE.

[Cite as *Collins v. Rizkana*, 1995-Ohio-135.]

*Employment relations—Cause of action may be brought for wrongful discharge in violation of public policy based on sexual harassment/discrimination.*

———————————

In Ohio, a cause of action may be brought for wrongful discharge in violation of public policy based on sexual harassment/discrimination.

(No. 94-136—Submitted April 26, 1995—Decided August 16, 1995.)

APPEAL from the Court of Appeals for Stark County, No. CA-9310.

———————————

{¶ 1} On May 8, 1992, appellant, Rebecca Collins, filed a complaint against appellee, Dr. Mahfouz Ali Rizkana, D.V.A., in the Stark County Court of Common Pleas, alleging wrongful discharge and intentional infliction of emotional distress. Dr. Rizkana filed an answer denying the allegations of the complaint.

{¶ 2} During pretrial discovery, each side took the deposition of the other. In appellant's deposition, Collins testified that she first worked for Dr. Rizkana at the Acme Animal Hospital in Canton, Ohio, between 1982 and 1986. She left the doctor's employ in 1986 because of "the groping and grabbing and touching." At that time, she took no remedial action because "sexual harassment was not thought of. *** I didn't know of the Ohio Civil Rights Commission or anything of that nature. I went directly to an unemployment bureau."

{¶ 3} However, in 1987, Collins returned to work for Dr. Rizkana after being assured that he would not touch her again. Shortly thereafter, she was given the position of manager at a salary of $300 per week. Beginning in 1988, Collins testified, Dr. Rizkana "would start the same thing. He'd get you in a corner, try to feel you up, he'd grab your hand, try to put it in his pants. If he had a chance as you

were walking by, he'd pinch your boob. He'd grab your butt when you were in the med room." She also testified that the doctor was "constantly talking of sexual stuff, wanting to know how my husband and my sex life was, that you never lived until you had a foreign experience. He told me about prostitutes that he had in I do believe it was Paris." At times, she would tell him "don't touch me, leave me alone. I would start getting loud. There have been times when he's put his hand across my mouth to shut me up or he would tell me, 'Shh, there's customers.' I didn't want him to touch me so I was getting loud." Also, "[t]here were times he tried to kiss [her]."

{¶ 4} In November 1991, a coworker had asked Dr. Rizkana if he had ever touched Collins. The doctor replied that she (the coworker) should ask Collins, to which Collins replied in the affirmative. Dr. Rizkana then became "very upset" and "that's when things started definitely going down on my job. *** [H]is attitude had changed towards me." On December 11, 1991, Dr. Rizkana handed Collins a "blank sheet of paper. *** He specifically told [her], 'I want you to write out a statement stating there's never been any sexual harassment in this office, that I have never touched you.'" Instead, Collins replied, "'My lawyer told me to never write my name on anything.'"

{¶ 5} Collins then testified that "as the day progressed, he was very quiet that day. And as I was getting ready to leave he told me, 'Oh, yeah, by the way,' he said, 'I'm dropping your pay by a hundred dollars a week,'" and appointed Collins's coworker to the position of office manager. The next day, Collins attempted to discuss the matter with Dr. Rizkana but he would only reply, "'Well, you're going to quit anyway so you might as well go,'" to which Collins said, "fine, you know, you have made me leave my job. You are the one that has actually made me leave. Here are your keys back."

{¶ 6} Collins then "drove directly to the Ohio Civil Rights Commission." She was precluded, however, from filing a complaint because Dr. Rizkana at no

2

time employed four or more persons and, therefore, did not fall within the definition of "employer" set forth in R.C. 4112.01(A)(2).

{¶ 7} Dr. Rizkana denied any form of sexual harassment or sexual discrimination. He testified that "[t]he only time she [Collins] mention[ed] sexual harassment is when she start[ed] asking for [a] raise and she saw [the] Anita Hill-Clarence Thomas case. 'You give me $50 or I will sue you for sexual harassment.'" Instead, Dr. Rizkana stated that although he never reduced Collins's pay, he did tell her that her excessive absenteeism was becoming a problem and that if she didn't work consistently, he would "cut every hour [she] call[ed] off." Thereafter, Collins quit, threatening a lawsuit for sexual harassment

{¶ 8} The trial court entered summary judgment in favor of Dr. Rizkana on Collins's wrongful discharge claim. The court found that "the *Greeley [v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981]* case clearly allows an exception to the employment-at-will doctrine only when an employee is discharged in violation of a statute. Plaintiff was not discharged in violation of R.C. 4112.02 because that statute only applies to an 'employer' who is defined in R.C. 4112.01(A)(2) as 'any person employing four or more persons within the state.' ([E]mphasis added[.]) Dr. Rizkana never employed *four* or more persons at the Acme Animal Hospital." Collins then voluntarily dismissed her claim for intentional infliction of emotional distress pursuant to Civ.R. 41(A)(1).

{¶ 9} The court of appeals affirmed the summary judgment upon a similar basis.

{¶ 10} The cause is now before the court pursuant to the allowance of a motion to certify the record.

———————————

*Karen Edwards-Smith* and *Robert A. Edwards*, for appellant.

*Gutierrez, Mackey & Tatarsky Co., L.P.A.*, and *Kathleen O. Tatarsky*, for appellee.

**ALICE ROBIE RESNICK, J.**

{¶ 11} The issue before the court is whether Ohio should recognize a common-law tort claim for wrongful discharge in violation of public policy based upon alleged sexual harassment/discrimination.

{¶ 12} As a threshold matter, we must construe the evidence most strongly in favor of Collins. Civ.R. 56(C). In so doing, we must conclude that a genuine issue of material fact remains as to whether Dr. Rizkana subjected Collins to a series of unwanted and offensive sexual contacts and retaliated against her for refusing to disclaim the occurrences, resulting in her constructive discharge.

{¶ 13} The traditional rule in Ohio and elsewhere is that a general or indefinite hiring is terminable at the will of either party, for any cause, no cause or even in gross or reckless disregard of any employee's rights, and a discharge without cause does not give rise to an action for damages. See *Phung v. Waste Mgt., Inc.* (1986), 23 Ohio St.3d 100, 102, 23 OBR 260, 261-262, 491 N.E.2d 1114, 1116; *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 19 OBR 261, 483 N.E.2d 150, paragraph one of the syllabus; *Henkel v. Educational Research Council of Am.* (1976), 45 Ohio St.2d 249, 255, 74 O.O.2d 415, 418, 344 N.E.2d 118, 121-122. See, also, *Wagenseller v. Scottsdale Mem. Hosp.* (1985), 147 Ariz. 370, 375-376, 710 P.2d 1025, 1030-1031. This has become known as the "employment-at-will" doctrine.

{¶ 14} In the latter half of the twentieth century, an exception developed throughout the country which has come to be known as a cause of action for "wrongful discharge," "abusive discharge," "retaliatory discharge," or "discharge in derogation of public policy." Under this exception, an employer who wrongfully discharges an employee in violation of a clearly expressed public policy will be subject to an action for damages. See, generally, Holloway & Leech, Employment Termination: Rights and Remedies (2 Ed.1993), Chapter 3.

{¶ 15} The origin of the public policy exception to the employment-at-will doctrine can be traced to the case of *Petermann v. Internatl. Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Local 396* (1959), 174 Cal.App.2d 184, 344 P.2d 25. There, the California appellate court held that:

"***It would be obnoxious to the interests of the state and contrary to public policy and sound morality to allow an employer to discharge any employee, whether the employment be for a designated or unspecified duration, on the ground that the employee declined to commit perjury, an act specifically enjoined by statute. The threat of criminal prosecution would, in many cases, be a sufficient deterrent upon both the employer and employee, the former from soliciting and the latter from committing perjury. However, in order to more fully effectuate the state's declared policy against perjury, the civil law, too, must deny the employer his generally unlimited right to discharge an employee whose employment is for an unspecified duration, when the reason for the dismissal is the employee's refusal to commit perjury." *Id.* at 188-189, 344 P.2d at 27.

{¶ 16} In the approximately thirty-five years since the *Petermann* decision, an overwhelming majority of courts have recognized a cause of action for wrongful discharge in violation of public policy. See Holloway & Leech, Employment Termination: Rights and Remedies, *supra,* at 135, fn. 5; Individual Employment Rights Manual (BNA Lab.Rel.Rptr.[1994]), Section 505:51; Annotation, Modern Status of Rule That Employer May Discharge At-Will Employee for Any Reason (1982), 12 A.L.R.4th 544. In adopting the exception, it is often pointed out that the general employment-at-will rule is a harsh outgrowth of outdated and rustic notions. The rule developed during a time when the rights of an employee, along with other family members, were considered to be not his or her own but those of his or her *paterfamilias*. The surrender of basic liberties during working hours is now seen "to present a distinct threat to the public policy carefully considered and adopted by society as a whole. As a result, it is now recognized that a proper

balance must be maintained among the employer's interest in operating a business efficiently and profitably, the employee's interest in earning a livelihood, and society's interest in seeing its public policies carried out." *Palmateer v. Internatl. Harvester Co.* (1981), 85 Ill.2d 124, 129, 52 Ill.Dec. 13, 15, 421 N.E.2d 876, 878. See, also, *Wagenseller, supra,* 147 Ariz. at 376, 710 P.2d at 1031; *Pierce v. Ortho Pharmaceutical Corp.* (1980), 84 N.J. 58, 417 A.2d 505; Blades, Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power (1967), 67 Colum.L.Rev. 1404, 1416-1418.

{¶ 17} In *Greeley, supra,* 49 Ohio St.3d at 233-234, 551 N.E.2d at 986, the court stated that "the time has come for Ohio to join the great number of states which recognize a public policy exception to the employment-at-will doctrine." Allowing a cause of action for wrongful discharge violative of R.C. 3113.213(D), the court held as follows:

"1.  Public policy warrants an exception to the employment-at-will doctrine when an employee is discharged or disciplined for a reason which is prohibited by statute.  (R.C. 3113.213[D], construed and applied.)

"2.  Henceforth, the right of employers to terminate employment at will for 'any cause' no longer includes the discharge of an employee where the discharge is in violation of a statute and thereby contravenes public policy.  (*Fawcett v. G.C. Murphy & Co.* [1976], 46 Ohio St.2d 245, 75 O.O.2d 291, 348 N.E.2d 144, modified.)

"3.  In Ohio, a cause of action for wrongful discharge in violation of public policy may be brought in tort."  *Id.* at syllabus.

{¶ 18} Recently in *Painter v. Graley* (1994), 70 Ohio St.3d 377, 639 N.E.2d 51, at paragraph three of the syllabus, this court held further that:

"'Clear public policy' sufficient to justify an exception to the employment-at-will doctrine is not limited to public policy expressed by the General Assembly in the form of statutory enactments, but may also be discerned as a matter of law

6

based on other sources, such as the Constitutions of Ohio and the United States, administrative rules and regulations, and the common law."

{¶ 19} In considering whether Collins has a viable cause of action in tort for wrongful discharge on the basis of alleged sexual harassment in accordance with the law as set forth in *Greeley* and *Painter*, we adopt the following suggested analysis in *Painter, supra*, 70 Ohio St. 3d at 384, 639 N.E.2d at 57, fn. 8:

"In reviewing future cases, Ohio courts may find useful the analysis of Villanova Law Professor H. Perritt, who, based on review of cases throughout the country, has described the elements of the tort as follows:

"'1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).

"'2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).

"'3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).

"'4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).' (Emphasis *sic*.)

"H. Perritt, The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie? (1989), 58 U.Cin.L.Rev. 397, 398-399."

{¶ 20} We note further that the clarity and jeopardy elements, "both of which involve relatively pure law and policy questions," are questions of law to be determined by the court. "The jury decides factual issues relating to causation and overriding justification." H. Perritt, The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?, *supra*, at 401.

{¶ 21} The first task then is to identify whether a clear public policy exists in Ohio which this conduct violates (the clarity element). There are at least two sources of statutorily expressed public policy prohibiting the alleged sexual

harassment/discrimination in this case, each independently sufficient to allow for the recognition of a cause of action for wrongful discharge in violation of public policy.

{¶ 22} First, as pertinent to the allegations in this case, R.C. 2907.06,[1] prohibiting sexual imposition, expresses a public policy protecting sexual bodily security and integrity and prohibiting offensive sexual contact. In addition, R.C. 2907.21 through 2907.25 prohibit prostitution, as well as compelling, promoting, procuring and soliciting prostitution. These are sufficiently clear expressions of public policy to justify an exception to the employment-at-will doctrine. In order to more fully effectuate the state's declared public policy against sexual harassment, the employer must be denied his generally unlimited right to discharge an employee at will, where the reason for the dismissal (or retaliation resulting in constructive discharge) is the employee's refusal to be sexually harassed. Although there may have been no actual crime committed, there is nevertheless a violation of public policy to compel an employee to forgo his or her legal protections or to do an act ordinarily proscribed by law.

---

1. R.C. 2907.06 provides:

"(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

"(1) The offender knows that the sexual contact is offensive to the other person, or one of the other persons, or is reckless in that regard.

"(2) The offender knows that the other person's, or one of the other person's, ability to appraise the nature of or control the offender's or touching person's conduct is substantially impaired.

"(3) The offender knows that the other person, or one of the other persons, submits because of being unaware of the sexual contact.

"(4) The other person, or one of the other persons, is thirteen years of age or older but less than sixteen years of age, whether or not the offender knows the age of such person, and the offender is at least eighteen years of age and four or more years older than such other person.

"(B) No person shall be convicted of a violation of this section solely upon the victim's testimony unsupported by other evidence.

"(C) Whoever violates this section is guilty of sexual imposition, a misdemeanor of the third degree."

{¶ 23} Other courts have similarly found the sex offense statutes in their respective jurisdictions to embody sufficiently clear expressions of public policy to justify the public policy exception in cases of sexual harassment/discrimination.  In *Watson v. Peoples Sec. Life Ins. Co.* (1991), 322 Md. 467, 588 A.2d 760, the plaintiff alleged that she was discharged in retaliation for having sued a coworker for sexual harassment. The harassment included two attempts by the coworker to bite the plaintiff's breast, the second attempt occurring even though the plaintiff had protested the first.  The court noted that Md. Crim. Law Code Ann. 464C (1990) makes it a fourth degree sexual offense for a person to engage in sexual contact with another person against the will and without the consent of the other person. *Id.* at 482, 588 A.2d at 767.  The court found that "[t]he clear mandate of public policy which Watson's discharge could be found to have violated was the individual's interest in preserving bodily integrity and personality, reinforced by the state's interest in preventing breaches of the peace, and reinforced by statutory policies intended to assure protection from workplace sexual harassment."  *Id.* at 481, 588 A.2d at 767.  The court explained that even "[h]ad Title VII or the [Maryland Fair Employment Practices] Act never been enacted, a clear mandate of public policy still supported Watson's recourse to legal redress against Strausser under the circumstances here," and concluded that "the same clear public policy which encourages Watson's legal recourse against one who degradingly assaulted her makes tortious a discharge that retaliates against that recourse."  *Id.* at 486, 588 A.2d at 769.  See, also, *Rojo v. Kliger* (1990), 52 Cal.3d 65, 91, 276 Cal.Rptr. 130, 146-147, 801 P.2d 373, 389-390.

{¶ 24} In *Wagenseller, supra,* the Supreme Court of Arizona was confronted with a claim that discharge was motivated by the plaintiff's refusal "to participate in activities which arguably would have violated [Arizona's] indecent exposure statute, A.R.S. { 13-1402." *Id.*, 147 Ariz. at 380, 710 P.2d at 1035.  The court explained that the statute recognizes "bodily privacy as a 'citizen's social

right.' *** We thus uphold this state's public policy by holding that termination for refusal to commit an act which might violate A.R.S. { 13-1402 may provide the basis of a claim for wrongful discharge. *** In this situation, there might be no crime, but there would be a violation of public policy to compel the employee to do an act ordinarily proscribed by the law." *Id*. at 380, 710 P.2d at 1035.

{¶ 25} In *Lucas v. Brown & Root, Inc*. (C.A.8, 1984), 736 F.2d 1202, plaintiff alleged that she was fired because she would not sleep with her foreman. In *Harrison v. Edison Bros. Apparel Stores, Inc*. (C.A.4, 1991), 924 F.2d 530, the plaintiff alleged termination motivated by her complaints against her manager stemming from conduct including unconsented-to sexual touching and requests for sex. Both courts, applying Arkansas and North Carolina law, respectively, reached the conclusion that a wrongful discharge claim is justified on the basis of each state's public policy prohibiting prostitution. Both courts also pointed out that even though the act, if consummated, may not have been criminally prosecuted, such fact would not serve to defeat a civil action where the plaintiff was fired for refusing to do what public policy forbids. *Lucas, supra*, at 1205; *Harrison, supra*, at 534.

{¶ 26} The second source of expressed public policy prohibiting sexual harassment/discrimination is R.C. 4112.02, which provides:

"It shall be an unlawful discriminatory practice:

"(A) For any employer, because of the race, color, religion, sex, national origin, handicap, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

{¶ 27} Additionally, in *Kerans v. Porter Paint Co*. (1991), 61 Ohio St.3d 486, 495, 575 N.E.2d 428, 435, we commented that the adoption of Title VII, "Section 2000e *et seq*., Title 42, U.S. Code, the enactment of R.C. Chapter 4112, and this court's recent decision in *Helmick v. Cincinnati Word Processing, Inc.*

(1989), 45 Ohio St.3d 131, 543 N.E.2d 1212, reflect Ohio's strong public policy against workplace-based sexual harassment."

{¶ 28} It is clear that a civil rights statute prohibiting employment discrimination on the basis of sex may provide the necessary expression of public policy on which to premise a cause of action for wrongful discharge based on sexual harassment/discrimination. See, *e.g., Kerrigan v. Magnum Entertainment, Inc.* (D.Md.1992), 804 F.Supp. 733; *Holien v. Sears, Roebuck & Co.* (1984), 298 Ore. 76, 689 P.2d 1292. See, also, *Clipson v. Schlessman* (1993), 89 Ohio App.3d 230, 236, 624 N.E.2d, 220, 224, where the Sixth District Court of Appeals aptly explained that:

"It is an unlawful discriminatory practice for an employer to discharge an employee without just cause because of a handicap. R.C. 4112.02(A). This statement of public policy has been effective since July 1976. Am.Sub.S.B. No. 162, 136 Ohio Laws, Part I, 424, 432, effective 7-23-76. Since appellant alleges that he was discharged for a reason prohibited by statute, public policy warrants an exception to the employment-at-will doctrine and appellant may bring a cause of action for wrongful discharge."

{¶ 29} The foregoing establishes a clear public policy against workplace sexual harassment. Thus, having found clear public policy sufficient to justify an exception to the employment-at-will doctrine, we must now determine whether sexually motivated dismissals would jeopardize the public policy (the jeopardy element). The issue that most often arises under the jeopardy analysis, and upon which the courts are split, is whether the public policy tort should be rejected where the statute expressing the public policy already provides adequate remedies to protect the public interest. This issue is oftentimes complicated by virtue of the fact that courts confuse it with the issue of preemption. See, *e.g., Watson, supra*, 322 Md. at 485-486, 588 A.2d at 768-769. See, generally, Annotation, Pre-emption of Wrongful Discharge Cause of Action by Civil Rights Laws (1994), 21 A.L.R.5th

1. In this case, however, there are two reasons why the availability of remedies under R.C. Chapter 4112 will not serve to defeat Collins's sexual harassment tort claim, irrespective of whether such statutory remedies would have a preclusive effect in other wrongful discharge cases.

{¶ 30} First, the issue of adequacy of remedies is confined to cases "[w]here right and remedy are part of the same statute which is the *sole source* of the public policy opposing the discharge." (Emphasis added.) *Watson, supra*, at 486, 588 A.2d at 769. In cases of *multiple*-source public policy, the statute containing the right and remedy will not foreclose recognition of the tort on the basis of some other source of public policy, unless it was the legislature's intent in enacting the statute to preempt common-law remedies. *Bennett v. Hardy* (1990), 113 Wash.2d 912, 784 P.2d 1258; *Rojo, supra; Froyd v. Cook* (E.D.Cal.1988), 681 F.Supp. 669; *Drinkwalter v. Shipton Supply Co., Inc*. (1987), 225 Mont. 380, 732 P.2d 1335[2]; *Holien, supra*, 298 Ore. at 91-97, 689 P.2d at 1300-1303. See, also, *Phillips v. J.P. Stevens & Co., Inc*. (M.D.N.C.1993), 827 F.Supp. 349, 352-353.

{¶ 31} In *Helmick, supra*, 45 Ohio St.3d 131, 543 N.E.2d 1212, at paragraphs one and two of the syllabus, we held that:

"R.C. Chapter 4112 was intended to add protections for victims of sexual harassment rather than reduce the protections and remedies for such conduct.

"Allowing a plaintiff to pursue common-law remedies in lieu of the relief provided under R.C. Chapter 4112 creates no conflict and serves to supplement the limited protection and coverage of that chapter."

---

2. As recognized in Romero v. J & J Tire, JMH, Inc. (Mont. 1989), 777 P.2d 292, and Harrison v. Chance (Mont.1990), 797 P.2d 200, the Montana Human Rights Act was amended in 1987 to provide that "[t]he provisions of this chapter establish the exclusive remedy for acts constituting an alleged violation of this chapter ***. No other claim or request for relief based upon such acts may be entertained by a district court other than by the procedures specified in this chapter." Mont.Code Ann. 49-2-509(7). Thus, Drinkwalter is superseded by statute. This, however, serves to illustrate the expression of legislative intent necessary to preempt common-law remedies.

**{¶ 32}** In so holding, the court explained that "there is nothing in the language or legislative history of R.C. Chapter 4112 barring the pursuit of common-law remedies for injuries arising out of sexual misconduct." *Id* at 133, 543 N.E.2d at 1215. The court concluded, "common-law tort actions are not preempted by R.C. Chapter 4112." *Id* at 135, 543 N.E.2d at 1216.

**{¶ 33}** Since Collins presents a viable wrongful discharge claim under *Greeley* independent of R.C. Chapter 4112, and since R.C. Chapter 4112 does not operate to preclude that claim, there is no need to consider whether the remedies contained in R.C. Chapter 4112 should serve as a basis to reject her claim.

**{¶ 34}** Second, in the context of this case, the availability of remedies under R.C. Chapter 4112 cannot serve to defeat Collins's wrongful discharge claim because those remedies are simply not available to Collins. She is precluded from availing herself of those remedies by virtue of R.C. 4112.01(A)(2), which removes her employer from the scope of R.C. Chapter 4112 because he never employed "four or more persons within the state." Since R.C. Chapter 4112 does not preempt common-law claims, we cannot interpret R.C. 4112.01(A)(2) as an intent by the General Assembly to grant small businesses in Ohio a license to sexually harass/discriminate against their employees with impunity. Instead, we can only read R.C. 4112.01(A)(2) as evidencing an intention to exempt small businesses from the burdens of R.C. Chapter 4112, not from its antidiscrimination policy. See *Kerrigan, supra*, 804 F.Supp. at 736..

**{¶ 35}** We do not mean to suggest that where a statute's coverage provisions form an essential part of its public policy, we may extract a policy from the statute and use it to nullify the statute's own coverage provisions. However, in the absence of legislative intent to preempt common-law remedies, we can perceive no basis upon which to find that R.C. 4112.01(A)(2) forms part of the public policy reflected in R.C. 4112.02(A). Therefore, we cannot find it to be Ohio's public policy that an

employer with three employees may condition their employment upon the performance of sexual favors while an employer with four employees may not.

{¶ 36} Thus, the issue of whether the availability of remedies should defeat a wrongful discharge claim is irrelevant and need not be decided in this case. Collins may therefore pursue her sexual harassment/discrimination claim irrespective of the remedies provided by R.C. Chapter 4112.

{¶ 37} We hold, therefore, that in Ohio, a cause of action may be brought for wrongful discharge in violation of public policy based on sexual harassment/discrimination.

{¶ 38} Accordingly, the decision of the court of appeals is reversed, and the cause is remanded to the trial court for further proceedings consistent with this opinion.

*Judgment reversed*

*and cause remanded.*

DOUGLAS, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., WRIGHT and COOK, JJ., concur in judgment only.

—————————————

**WRIGHT, J., concurring in judgment only.**

{¶ 39} I agree with the majority opinion to the extent that it recognizes a cause of action in tort for the wrongful discharge of an employee in violation of public policy against offensive sexual contact, as manifested in R.C. 2907.06. In the interest of judicial restraint, I would decide this case on that narrow, but dispositive, basis.

————————————