ZAJC, Appellant,

v.

**HYCOMP, INC. et al., Appellees.**

[Cite as *Zajc v. Hycomp, Inc.,* 172 Ohio App.3d 117, 2007-Ohio-2637.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 88421.

Decided May 31, 2007.

118

McCarthy, Lebit, Crystal & Liffman, L.P.A., and Ann–Marie Ahern; The Simon Law Firm, L.L.P., and Steven D. Bell, for appellant.

Cohen & Grigsby, P.C., and Nancy L. Heilman; Frantz Ward, L.L.P.; Michael J. Frantz, and Jennifer Whitney, for appellees.

ANN DYKE, Judge.

{¶ 1} The plaintiff, David Zajc, appeals from the order of the trial court that awarded summary judgment to defendant Hycomp, Inc. in plaintiff's action for wrongful discharge. For the reasons set forth below, we reverse and remand for further proceedings consistent with this opinion.

{¶ 2} After receiving bachelor's and master's degrees in mechanical engineering, plaintiff was hired as a manufacturing engineer by Hycomp in 2000. In March 2004, plaintiff was offered the position of quality manager. In that position, plaintiff administered Hycomp's quality plan, which creates the legally required record of the manufacture and inspection of parts used for aircraft.

{¶ 3} Thereafter, Eugene Gargas, the operations manager of Hycomp, informed plaintiff that he would like plaintiff to receive training to become the Designated Supplier Quality Representative ("DSQR") for Hycomp's customer, General Electric Aircraft Engines ("GE"). The DSQR essentially acts in the nature of an agent for GE in evaluating the parts manufactured by Hycomp.

{¶ 4} After becoming certified for the position of DSQR, plaintiff had ultimate authority within Hycomp to determine whether the parts met customer requirements, but a source inspector would have the authority to override the DSQR's determination. Plaintiff was also given an identification number from GE to be used for marking parts following his inspection.

{¶ 5} In early March 2005, plaintiff was inspecting a part for a borehole, a feature that lights and magnifies the view of an aircraft engine. According to plaintiff, the diameter of the hole of the part was too small and did not fit properly into the measuring device. Plaintiff was not satisfied with the part and informed Gargas. The next day, a Mr. Rinard and a Mr. Hanna confronted him and demanded that the parts be sent to GE because the customer needed them. Other employees were able to get the measuring device through the hole with pressure, but plaintiff insisted that the hole was too small. According to plaintiff, Gargas demanded that plaintiff ship the parts and gave him 30 minutes to clean out his desk when he refused to do so.

{¶ 6} With regard to a prior incident, another parts inspector had determined that the part was noncompliant, and plaintiff agreed, but Gargas had accused him of being "nitpicky."

{¶ 7} Plaintiff filed suit against Hycomp and Gargas on April 4, 2005, alleging that the termination violated public policy. In his amended complaint, plaintiff

alleged that he was responsible for the final inspection of certain parts manufactured by Hycomp for use in aircraft and that his inspection had revealed that the parts "did not meet contract specifications and/or had serious quality problems or potential quality problems." He further alleged that he was terminated for refusing to ship the parts.

{¶ 8} Defendants admitted that plaintiff's job involved the inspection of parts but denied that he complained to management about the quality of the parts and denied requiring plaintiff to ship nonconforming parts.

{¶ 9} Defendant moved for summary judgment and asserted that plaintiff could not establish the existence of a clear public policy sufficient to justify an exception to the employment-at-will doctrine (the "clarity" element of his claim for relief). Hycomp maintained that plaintiff's reliance upon the Uniform Commercial Code ("UCC") and the Ohio Products Liability Act was misplaced. Moreover, Robert Scoular, president of Hycomp, averred that plaintiff:

{¶ 10} "Made certain incorrect assumptions about aircraft or 'aerospace' parts creating a potential danger [as] not all component parts manufactured for use in the aerospace industry are 'flight critical.' Parts that are not 'flight critical' do not affect the operation of a final product in a way that could create a risk of personal injury or endanger public safety."

{¶ 11} Hycomp also asserted that plaintiff could not establish that the dismissal of similarly situated employees would jeopardize such public policy (the "jeopardy" element of the claim for relief). Hycomp's parts are again tested by the customer before final shipment to the end user.

{¶ 12} Finally, Scoular averred that he had made the decision to terminate plaintiff approximately one month prior to the actual termination and that plaintiff did not meet the criteria of a "statutory whistleblower."

{¶ 13} In opposition, plaintiff established that he had supervised Hycomp's inspectors and had maintained the documentation required for the manufacture of aerospace parts. As DSQR for GE, he was required to act as GE's agent in conducting the inspections and in certifying to GE that such parts met the contractual requirements. All parts were to be inspected, regardless of whether they were "flight critical" or not, and in any event, they were destined to be used as "internal parts in jet aircraft engines." Plaintiff further deposed that he was fired and given "30 minutes to clean out his desk" immediately after a heated discussion with Gargas in which he refused to follow Gargas's demand that he ship the parts at issue.

{¶ 14} The trial court determined that the UCC and the Ohio Products Liability Act did not set forth a basis for meeting the clarity element of the claim for relief. It further held that the jeopardy element of the claim for relief was

not met because "if a product injures someone, then he or she may bring a lawsuit to address the injury," and if GE deemed the products nonconforming under the UCC, then GE can "follow the steps in the UCC and return the goods to Hycomp."

{¶ 15} Plaintiff now appeals and asserts that the lower court erred in determining that he could not establish his claim for relief.

{¶ 16} With regard to procedure, we note that an appellate court reviews a trial court's grant of summary judgment de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241. "*De novo* review means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial." *Brewer v. Cleveland City Schools* (1997), 122 Ohio App.3d 378, 383, 701 N.E.2d 1023, citing *Dupler v. Mansfield Journal* (1980), 64 Ohio St.2d 116, 119–120, 18 O.O.3d 354, 413 N.E.2d 1187.

{¶ 17} Summary judgment is appropriate when it appears that (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. *Harless v. Willis Day Warehousing Co., Inc.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 375 N.E.2d 46; Civ.R. 56(C).

{¶ 18} The party seeking summary judgment bears the burden of showing that no genuine issue of material fact exists for trial. *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265; *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 115, 526 N.E.2d 798. Doubts must be resolved in favor of the nonmoving party. *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 358–359, 604 N.E.2d 138.

{¶ 19} The nonmoving party must produce evidence on any issue for which that party bears the burden of production at trial. *Wing v. Anchor Media, Ltd.* (1991), 59 Ohio St.3d 108, 111, 570 N.E.2d 1095; *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548, 91 L.Ed.2d 265. In accordance with Civ.R. 56(E), "a nonmovant may not rest on the mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." *Chaney v. Clark Cty. Agricultural Soc.* (1993), 90 Ohio App.3d 421, 424, 629 N.E.2d 513.

{¶ 20} In this matter, plaintiff alleged that he was terminated for refusing to ship nonconforming parts to Hycomp's customer General Electric Aircraft Engines on or about March 7, 2005. Hycomp asserted, however, that the decision to terminate plaintiff had been made in February 2005 and that he was terminated because his performance was not "up to par," he was insubordinate at

a meeting, and he missed work. This factual dispute constitutes a genuine issue of material fact.

{¶ 21} With regard to the trial court's determination that Hycomp was entitled to judgment as a matter of law because plaintiff had failed to establish the clarity and jeopardy elements of his claim for relief, we begin by noting that in *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981, paragraph two of the syllabus, the Ohio Supreme Court created an exception to the traditional common-law doctrine of employment at will whereby a discharge is in violation of a statute and thereby contravenes public policy. *Greeley* was later expanded to recognize a cause of action in tort when the wrongful discharge violated the "Constitutions of Ohio and the United States, administrative rules and regulations, and the common law." *Painter v. Graley* (1994), 70 Ohio St.3d 377, 639 N.E.2d 51, paragraph three of the syllabus.

{¶ 22} In order to support a claim for discharge in violation of public policy, a plaintiff must demonstrate (1) the existence of a clear public policy sufficient to justify an exception to the employment-at-will doctrine that is manifested in a state or federal constitution, statute, administrative regulation, or common law (the "clarity" element); (2) that the dismissal of employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the "jeopardy" element); (3) that the plaintiff's dismissal was motivated by conduct related to the public policy (the "causation" element); and (4) that the employer lacked overriding legitimate business justification for the dismissal (the "overriding justification" element). *Collins v. Rizkana* (1995), 73 Ohio St.3d 65, 69–70, 652 N.E.2d 653; *Painter v. Graley*, 70 Ohio St.3d 377, 639 N.E.2d 51.

{¶ 23} The first two elements, "the clarity and jeopardy elements [of the tort of wrongful discharge] are questions of law to be determined by the court." *Collins v. Rizkana*, 73 Ohio St.3d at 70, 652 N.E.2d 653. As to the issue of clarity, the question is whether there is a clear public policy to protect a specific public interest sufficient to justify an exception to the at-will employment doctrine. Id. The causation and overriding-justification elements are questions of fact for the trier-of-fact. Id.

{¶ 24} Plaintiff asserts that he articulated a clear public policy violation because he acted to prevent defective products from being released to the stream of commerce. He therefore asserts that the UCC and Ohio Products Liability Act establish the clarity element. He further notes that as a manufacturer of aerospace parts, Hycomp is required by law to have a quality plan in place to document its inspection of the parts.

{¶ 25} We conclude that plaintiff established the existence of a clear public policy sufficient to justify an exception to the employment-at-will doctrine. The UCC provisions permit a buyer to reject products that are nonconforming, the Products Liability Act imposes strict liability where the risks exceed the benefits of a design, R.C. 2307.75 and 2307.76; cf. *Bowling v. Heil* (1987), 31 Ohio St.3d 277, 31 OBR 559, 511 N.E.2d 373, and perhaps most significantly, Section 447, Title 49, U.S.Code authorizes the Federal Aviation Administration to regulate the production of aircraft and perform inspections, and it sets forth standards. Section 221, Title 14, C.F.R. provides that a production-inspection system must be in place to determine, inter alia, that subcontracted parts are as specified in the design data, that parts are inspected, and that inspection records are maintained. Moreover, Hycomp admits that quality policy and procedures must be "audited yearly in accordance with the requirements recognized in the aerospace industry."

{¶ 26} We therefore conclude that the trial court erred insofar as it determined that plaintiff could not establish this element as a matter of law.

{¶ 27} Hycomp insists, and the trial court agreed, that the proffered authority is insufficient because it does not establish a policy of *prohibiting the termination* of an employee who raises objections to the safety of the product. We do not agree, as the Supreme Court case law clearly expanded the scope of the wrongful-discharge tort so that it is not limited to situations in which the discharge violates a statute. *Wiles v. Medina Auto Parts,* 96 Ohio St.3d 240, 2002-Ohio-3994, 773 N.E.2d 526 ("a valid *Greeley* claim is not limited to situations where the discharge violates a statute").

{¶ 28} Moreover, case law demonstrates that the cited policy need not prohibit discharge per se. See *Bidwell v. Children's Med. Ctr.* (Nov. 26, 1997), Montgomery App. No. 16402, 1997 WL 736497 (allegation that co-employee threatened plaintiff, that plaintiff reported threats and was disciplined and co-employee was not, and that plaintiff was retaliated against for informing supervisor of problems in the department stated a claim for discharge in violation of public policy); see, also, *Collins v. Rizkana,* 73 Ohio St.3d 65, 652 N.E.2d 653 (R.C. 2907.06, which prohibits sexual imposition, and R.C. 2907.21 through 2907.25, which prohibit prostitution, as well as compelling, promoting, procuring, and soliciting prostitution, express a public policy that justifies an exception to the employment-at-will doctrine); *Anders v. Specialty Chem. Resources* (1997), 121 Ohio App.3d 348, 700 N.E.2d 39 (alleged failure to participate in insurance fraud and/or falsification of insurance claims set forth a violation of public policy sufficient to support a claim for relief); *Sabo v. Schott* (1994), 70 Ohio St.3d 527, 639 N.E.2d 783 (alleged retaliation for testifying truthfully stated a claim for wrongful discharge in violation of public policy); *Wilmot v. Forest City Auto*

*Parts* (June 22, 2000), Cuyahoga App. No. 75945, 2000 WL 804616 (same); *Chapman v. Adia Servs., Inc.* (1997), 116 Ohio App.3d 534, 688 N.E.2d 604 (alleged retaliation for consulting an attorney about possible claims that would affect the employer's business interests stated a claim for discharge in violation of public policy).

{¶ 29} Moreover, we note that in *Micek v. Flightsafety Internatl., Inc.* (Jan. 4, 2006), S.D. Ohio No. 2:03–CV–1015, 2006 WL 22179, it was not disputed that the plaintiff had established that his discharge was in violation of public policy, where he alleged that he was fired for expressing public-safety-related concerns and complaints about a pilot trainee.

{¶ 30} In *Armstrong v. Trans–Service Logistics, Inc.*, Coshocton App. No. 04CA015, 2005-Ohio-2723, 2005 WL 1301691, the court recognized the public policy favoring reporting violations of the regulations that are designed to keep impure and adulterated food and drugs out of the channels of commerce as sufficient to support the clarity element. See, also, *Powers v. Springfield City Schools* (June 26, 1998), Clark App. No. 98–CA–10, 1998 WL 336782 (the policy of requiring a certain class of professionals to report their suspicions of child abuse was sufficient to support the clarity element).

{¶ 31} Defendant relies upon *Celeste v. Wiseco Piston,* Lake App. No. 2004–L–073, 2005-Ohio-6893, 2005 WL 3528877, for the proposition that the products-liability statutes did not establish the clarity element. In that case, a majority of the panel held that such policy was embodied within the whistleblower statute and that the plaintiff had failed to follow the dictates of this statute. We find this case distinguishable, as the plaintiff in *Celeste* conceded that the underlying policy was codified within the whistleblower statute. In this case, however, there is no such concession and, in the products-liability statutes must be considered in relation to the federal statutory and regulatory provisions authorizing the FAA to regulate the production of aircraft, set forth standards, and perform inspections, and Section 221, Title 14, C.F.R. provides that a production-inspection system must be in place to determine, inter alia, that subcontracted parts be as specified in the design data, that parts are inspected, and that inspection records are maintained.

{¶ 32} As to Hycomp's additional claim that plaintiff's claim is barred because he did not comply with the requirements of the whistleblower statute, R.C. 4113.52, we note that the Supreme Court in *Kulch v. Structural Fibers* (1997), 78 Ohio St.3d 134, 677 N.E.2d 308, held that the plaintiff was entitled to maintain a *Greeley* claim whether or not he had complied with the dictates of R.C. 4113.52 in reporting his employer to the Occupational Safety and Health Administration ("OSHA"). Accord *Pytlinski v. Brocar Prods.* (2002), 94 Ohio St.3d 77, 760 N.E.2d 385.

{¶ 33} As to the second element, we conclude that the termination of employees under circumstances like those involved in this matter would jeopardize public policy. Employees such as plaintiff are entrusted with the inspection duties imposed by law, and, Hycomp admits, act essentially as the customer's agent in determining whether there is compliance. Nonetheless, such employees remain employees of Hycomp. Moreover, such employees are entrusted with carrying out the inspections set forth in the federal regulations.

{¶ 34} In accordance with the foregoing, we conclude that the trial court erred in determining that the jeopardy element was not met. For all of the foregoing reasons, the assignment of error is well taken. This matter is reversed and remanded for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

KILBANE, J., concurs.

GALLAGHER, P.J., dissents.

GALLAGHER, Presiding Judge, dissenting.

{¶ 35} I respectfully dissent from the majority decision in this case. I do not believe that Zajc has demonstrated a clear public policy that has been jeopardized by his termination. I would hold that summary judgment was properly granted to Hycomp in this action.

{¶ 36} Generally, absent an employment contract, the employer/employee relationship is considered at-will. *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981. Thus, the employer may terminate the employee for any lawful reason, and the employee may leave the relationship for any reason. Id. As recognized by the majority, there are exceptions to the general rule. In *Greeley,* the Supreme Court of Ohio held that an exception to the traditional at-will employment rule exists when an employee is terminated wrongfully in violation of public policy. Id. at 235, 551 N.E.2d 981.

{¶ 37} The majority opinion sets forth the elements that must be demonstrated to support a claim for discharge in violation of public policy. At issue in this case are the clarity and jeopardy elements, which are questions of law to be determined by the court.

{¶ 38} Zajc argues that the termination of his employment violated clear public policy as manifested in R.C. Chapters 1302 and 2307 (the Ohio Uniform Commercial Code ("UCC") and the Ohio Products Liability Act) because he was terminated for refusing to participate in the shipment of airplane parts to GE that he believed did not conform to the manufacturer's specifications. Zajc fails to point

to any evidence that would indicate that he had expressed any legitimate safety concerns in refusing to ship the parts. Indeed, there was no evidence to suggest whether these parts were "flight critical" parts. Instead, the record simply indicates that he felt the parts were nonconforming, and therefore, he refused to ship them.

{¶ 39} Absent evidence that Zajc had expressed any safety concerns, it does not appear from the record that Zajc's termination was in violation of any clear public policy. Indeed, rather than asserting a wrongful-termination claim based upon the public policy embedded in Ohio's whistleblower statute, R.C. 4113.52, Zajc has attempted to frame a public policy concern under the UCC, which pertains to commercial transactions, and Ohio's Product Liability Act, which favors the protection of consumers from defective products.[1]

{¶ 40} Absent facts demonstrating a clear safety concern, I do not find any clear public policy expressed in the above statutes that would be jeopardized by the termination of an employee who disagrees with his employer about whether a part is nonconforming or defective and then disobeys instructions to ship the goods.

{¶ 41} The UCC addresses the general obligations of buyers and sellers of goods. In support of his public policy argument, Zajc cites R.C. 1302.26, which pertains to express warranties by a seller that the goods are in conformity with their description. I fail to find any "clear" public policy manifested under this provision that would prohibit the discharge of an employee who expresses a belief that a product fails to conform to a written description and refuses to ship the allegedly nonconforming goods, despite being instructed to do so by his employer. In fact, the UCC specifically provides for the shipment of nonconforming goods and establishes remedies with respect thereto. See R.C. 1302.88 and 1302.95.

{¶ 42} With respect to the product-liability statute, R.C. 2307.74, Zajc claims that there is a clear public policy to discourage manufacturers from allowing defective goods to leave their possession and to protect the public from defective products. Here again, adequate remedies are provided to claimants who are proximately harmed by a defective product. R.C. 2307.73.

{¶ 43} Insofar as the issue of public safety is raised, Zajc fails to show how any public safety was endangered in this case or that he raised any public safety concerns when he refused to ship the parts. Indeed, Zajc was unaware of whether the particular goods were "flight critical" or "non-flight critical" compo-

---

1. In *Celeste v. Wiseco Piston*, Lake App. No. 2004–L–073, 2005-Ohio-6893, 2005 WL 3528877, the court held that an appellant who attempted to assert a wrongful-discharge claim under Ohio's Product Liability Act had failed to identify a "clear public policy" source separate from the whistleblower statute.

nents. Additionally, the parts were presented to a third-party source inspector before release to the customer. The source inspector approved the parts for shipment, and Zajc does not contend that any nonconforming parts were actually shipped to the customer. There was also evidence that the parts manufactured by Hycomp are thoroughly tested by Hycomp's customers before being shipped to an end user. As pointed out by Hycomp, much of Zajc's argument is speculative and premised on a theoretical risk of personal injury to third parties.

{¶ 44} In this case, Zajc is asking us to find a clear public policy that an employer cannot discharge an employee who disagrees about the quality of parts and refuses to ship the parts without any showing that public safety is being endangered. I do not believe that Zajc has shown that the *narrow* public policy exception to the employment-at-will doctrine should be extended based on the limited facts in this case. Simply put, Zajc has failed to demonstrate a clear public policy under the UCC or Ohio's Product Liability Act that has been jeopardized by his termination in this matter. Thus, I respectfully dissent from the majority's holding in this case.

{¶ 45} For the foregoing reasons, I would affirm the judgment of the trial court.