SWINK, Appellant,

v.

GREATER CLEVELAND REGIONAL TRANSIT AUTHORITY, Appellee.

[Cite as *Swink v. Greater Cleveland Regional Transit Auth.*, 185 Ohio App.3d 813, 2009-Ohio-6105.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 92725.

Decided Nov. 19, 2009.

David W. Neel, L.L.C., and David W. Neel, for appellant.

Edward J. Opett, Senior Counsel, Anna Hlavacs, and Kathleen M. Minahan, for appellee.

COLLEEN CONWAY COONEY, Administrative Judge.

{¶ 1} Plaintiff-appellant, Thomas Swink, appeals the trial court's grant of summary judgment for the defendant-appellee, Greater Cleveland Regional Transit Authority ("RTA"). Finding no merit to the appeal, we affirm.

{¶ 2} This case arose in November 2006, when Swink, a former employee of RTA, sued RTA, claiming that he had been constructively discharged and wrongfully terminated on the basis of race and in violation of public policy. In January 2009, the trial court granted RTA's motion for summary judgment.

{¶ 3} Swink appeals, arguing in his sole assignment of error that the trial court erred in granting summary judgment.

{¶ 4} The following facts underlie this appeal. RTA is a political subdivision of the state of Ohio that operates public bus and rail transportation services.

{¶ 5} Swink began his career with RTA in May 1997 as a maintenance training specialist and was promoted to the position of equipment manager for the Woodhill–Triskett District in May 2000. It is undisputed that he was an at-will employee. His supervisor was William Eltrich, the director of the Triskett operation. As equipment manager, Swink participated in the construction of the new Triskett Road bus garage. Miklos Nagy, an RTA senior engineer, was the project manager for the new Triskett garage project. Swink and Nagy worked closely together on the project.

{¶ 6} RTA retained the architectural and design firm of Richard L. Bowen to write the scope of the work that was to include the same design as the Hayden Road garage. However, at Swink's insistence, the Triskett garage was to contain a gantry bus-wash system rather than the drive-through style that the Hayden Road garage contained.

{¶ 7} RTA solicited bids for the project but solicited a second round of bids because of procedural problems. The general trades contract for the project was awarded to the A.M. Higley Company.

{¶ 8} Construction began in August 2003, and in October 2003, Higley requested permission to substitute a less expensive bus-wash system, the NS brand system. Nagy gave the substitution request to Swink but warned him not to challenge it. Swink refused Higley's request, so Nagy asked him to prepare a detailed report explaining why the NS system did not meet the contract's requirements. Higley had based its winning bid on the NS system, so its costs would increase if it had to use the Whiting system, which complied with RTA contract requirements.

{¶ 9} In August 2004, two months before RTA terminated Swink, Tony Husczca warned Swink that RTA was watching him and wanted to get rid of him. Husczca was the Triskett garage project's construction superintendent and second in command to Nagy. He told Swink that Swink was taking money out of people's pockets with his insistence on the Whiting system. Swink received similar warnings from Al King, the transportation manager at the Triskett garage, and from Tony Russo, the equipment manager at RTA's Central Bus Maintenance facility.

{¶ 10} On August 30, 2004, Swink removed empty RTA barrels from the back of an RTA facility with the help of an employee whom he supervised. Swink did not have permission to take the empty barrels. He returned them the next day

and threw them in the dumpster with the help of his crew chief. He claimed that RTA employees routinely took these barrels without permission.

{¶ 11} On October 4, 2004, RTA transit police received letters from several RTA employees stating that they had observed Swink removing RTA-owned barrels. The transit police concluded that Swink had violated a rule in the RTA personnel, policies, and procedures manual, which governed Swink's employment. Specifically, the manual forbade employees to remove RTA property for personal or private gain. Employees violating the policy could be disciplined, up to and including termination.

{¶ 12} Eltrich recommended that RTA discharge Swink for his behavior. He met with Swink on November 12, 2004, to inform him that the transit police investigation showed that Swink had removed the barrels and violated RTA policy. Swink requested to meet with Michael York, RTA's deputy general manager of operations, and Scott Ferraro, RTA's director of labor and employee relations. When the three met, Swink defended himself, and York and Ferraro advised him that he could resign. Swink returned to his office and worked the remainder of the day. Three days later, Swink resigned.

{¶ 13} Appellate review of summary judgment is de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241; *Zemcik v. LaPine Truck Sales & Equip. Co.* (1998), 124 Ohio App.3d 581, 585, 706 N.E.2d 860. The Ohio Supreme Court set forth the appropriate test in *Zivich v. Mentor Soccer Club* (1998), 82 Ohio St.3d 367, 369–370, 696 N.E.2d 201, as follows:

> Pursuant to Civ.R. 56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor. *Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus. The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292–293, 662 N.E.2d 264, 273–274.

{¶ 14} Once the moving party satisfies its burden, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E); *Mootispaw v. Eckstein* (1996), 76 Ohio St.3d 383, 385, 667 N.E.2d 1197. Doubts must be resolved in favor of the nonmoving party. *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 358–359, 604 N.E.2d 138.

{¶ 15} On appeal, Swink challenges only the dismissal of his claims for constructive discharge in violation of public policy and breach of implied contract. Swink's complaint alleged that he had "a right to be treated fairly and impartially prior to his termination," i.e., that he was entitled to a pretermination hearing. "Ohio, however, does not recognize claims for breach of covenant of good faith and fair dealing in wrongful discharge actions." *Smith v. Council for Economic Opportunities in Greater Cleveland* (Oct. 12, 1995), Cuyahoga App. No. 68032, 1995 WL 601118; *Kuhn v. St. John & West Shore Hosp.* (1989), 50 Ohio App.3d 23, 552 N.E.2d 240. And the evidence in the instant case demonstrates that Swink received a pretermination hearing when he met with York and Ferraro three days before he submitted his resignation. Accordingly, we review only whether the trial court wrongly granted summary judgment on Swink's claim for constructive discharge in violation of public policy.

{¶ 16} The Ohio Supreme Court explained the standard for constructive discharge in *Mauzy v. Kelly Servs., Inc.* (1996), 75 Ohio St.3d 578, 588–589, 664 N.E.2d 1272, as follows:

Courts generally apply an objective test in determining when an employee was constructively discharged, viz., whether the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign. [*Clowes v. Allegheny Valley Hosp.* (C.A.3, 1993), 991 F.2d 1159, 1161]; *McCann v. Litton Systems, Inc.* (C.A.5, 1993), 986 F.2d 946, 951; *Stephens v. C.I.T. Group/Equipment Financing, Inc.* (C.A.5, 1992), 955 F.2d 1023, 1027; *Spulak v. K Mart Corp.* (C.A.10, 1990), 894 F.2d 1150, 1154; *Levendos v. Stern Entertainment, Inc.* (C.A.3, 1988), 860 F.2d 1227, 1230–1231.

In applying this test, courts seek to determine whether the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent. They recognize that there is no sound reason to compel an employee to struggle with the inevitable simply to attain the 'discharge' label. No single factor is determinative. Instead, a myriad of factors are considered, including reductions in sales territory, poor performance evaluations, criticism in front of coemployees, inquiries about retirement intentions, and expressions of a preference for employees outside the protected group.

{¶ 17} We find that the evidence demonstrates that Swink was constructively discharged. Swink testified at his deposition that his supervisor, Eltrich, suggested that he resign rather than wait to be terminated. This conversation occurred at a meeting on November 12, 2004, which was "to be construed as a pretermination" meeting. Eltrich informed Swink that he had decided to terminate him, and nothing Swink said could change his mind. Although RTA claims that Swink voluntarily resigned, it does not dispute that Eltrich suggested that

Swink resign rather than subject himself to termination. Given that the undisputed facts show that Swink was advised that termination was imminent and that Swink could do nothing to change that fact, Swink was constructively discharged.

{¶ 18} We next turn to whether the discharge gave rise to a claim for wrongful discharge in violation of public policy. Traditionally, an employer could terminate the employment of an at-will employee for any cause, at any time whatsoever, even if the termination was done in gross or reckless disregard of the employee's rights. *Phung v. Waste Mgt., Inc.* (1986), 23 Ohio St.3d 100, 102, 23 OBR 260, 491 N.E.2d 1114. However, in *Greeley v. Miami Valley Maintenance* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981, the Ohio Supreme Court recognized an exception to an employer's plenary right to terminate its employee's employment: an employer may not discharge an employee in violation of public policy. If an employer does so, the discharged employee may bring a tort action against the employer. Id. In *Painter v. Graley* (1994), 70 Ohio St.3d 377, 639 N.E.2d 51 at paragraph three of the syllabus, the Ohio Supreme Court held that Ohio courts may discern the public policy from "sources, such as the Constitutions of Ohio and the United States, administrative rules and regulations, and the common law."

{¶ 19} The elements of a claim of wrongful discharge in violation of public policy are

" '1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).

" '2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).

" '3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).

" '4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).' "

*Leininger v. Pioneer Natl. Latex*, 115 Ohio St.3d 311, 2007-Ohio-4921, 875 N.E.2d 36, ¶ 9–12, overruled on other grounds by *Meyer v. United Parcel Serv., Inc.*, 122 Ohio St.3d 104, 2009-Ohio-2463, 909 N.E.2d 106, quoting *Painter v. Graley* (1994), 70 Ohio St.3d 377, 384, 639 N.E.2d 51, fn. 8, quoting H. Perritt, The Future of Wrongful Discharge Claims: Where Does Employer Self Interest Lie? (1989) 58 U.Cin.L.Rev. 397, 398–399.

{¶ 20} The first two elements of a claim for wrongful discharge in violation of public policy are questions of law that a court should determine, but

the latter two are questions for the trier of fact.  *Collins v. Rizkana* (1995), 73 Ohio St.3d 65, 652 N.E.2d 653.

{¶ 21} We find that Swink did not meet his burden to demonstrate the first two elements of his claim.  He maintains that his termination violated the public policy espoused in R.C. 9.312, which regulates the competitive bidding process for state agencies and political subdivisions, and R.C. 306.43, which regulates the competitive bidding process for RTA contracts over $100,000.[1]  The evidence, however, shows no connection to this policy because the project was competitively bid, the low bidder was awarded the contract, and Swink insisted the contract specifications be followed.  Thus, the law was followed, and there is no evidence that Swink's discharge involved this policy regarding competitive bidding.

{¶ 22} Moreover, Swink has not met the second element—that dismissing him jeopardized this public policy.  When analyzing this element, a court must inquire "into the existence of any alternative means of promoting the particular public policy to be vindicated by a common-law wrongful-discharge claim."  *Wiles v. Medina Auto Parts*, 96 Ohio St.3d 240, 2002-Ohio-3994, 773 N.E.2d 526.  If a statutory remedy that adequately protects society's interests already exists, then there is no need to recognize a claim for wrongful discharge in violation of public policy.  Id.

{¶ 23} In the instant case, there were alternative means of promoting the public policy at issue.  R.C. 9.312(B) provides that if a state agency or political subdivision awards a contract to a bidder other than the lowest bidder, then the lowest bidder can file a written protest, which must be reviewed before the contract is finalized.  If the governmental body overrules the lowest bidder's written protest, the lowest bidder may bring an action for injunction.  See, e.g. *Cleveland Const., Inc. v. Ohio Dept. of Adm. Serv., Gen. Serv. Adm.* (1997), 121 Ohio App.3d 372, 700 N.E.2d 54.  Similarly, a wronged bidder under R.C. 306.43 may sue to remedy its injury.  See, e.g., *Yellow Cab of Cleveland, Inc. v. Greater Cleveland Reg. Transit Auth.* (1991), 72 Ohio App.3d 558, 595 N.E.2d 508; *L.B.J., Inc. v. Greater Cleveland Reg. Transit Auth.* (Nov. 23, 1983), Cuyahoga App. No. 46764, 1983 WL 2807.

{¶ 24} Moreover, there is no evidence that RTA violated R.C. 306.43, because RTA awarded the Triskett garage project to the lowest bidder, Higley.  Swink's insistence that Higley install the more expensive system specified in the contract

---

1.  Swink's complaint alleged only that RTA awarded the contract in order to receive kickbacks, and as a result of his actions, the winning bidder was forced to install the system at a higher cost, thereby resulting in lower or no kickbacks.  The clear public policy to which he referred involved "preventing graft and corruption of public officials."

protected public policy. Swink never produced any evidence to support his bald assertion that he prevented a kickback by insisting on the original bus-wash system.

{¶ 25} Based on the foregoing, Swink did not meet his burden to maintain his claim for wrongful discharge in violation of public policy, and the trial court properly granted summary judgment.

{¶ 26} Judgment is affirmed.

Judgment affirmed.

GALLAGHER, J., concurs.

STEWART, J., dissents.

MELODY J. STEWART, Judge, dissenting.

{¶ 27} I respectfully dissent from the decision reached by the majority in this case. I believe that Swink has demonstrated a *Greeley* claim sufficient to withstand summary judgment being granted against him as a matter of law.

{¶ 28} As the majority notes, the Supreme Court of Ohio in *Painter v. Graley* (1994), 70 Ohio St.3d 377, 639 N.E.2d 51, held that public policy may be "discerned as a matter of law based on * * * sources, such as the Constitutions of Ohio and the United States, administrative rules and regulations, and the common law." Id. at paragraph three of the syllabus. Further, this court in *Zajc v. Hycomp,* 172 Ohio App.3d 117, 2007-Ohio-2637, 873 N.E.2d 337, noted that wrongful-discharge claims are not limited to violations of statutes. The majority states that Swink did not meet his burden of demonstrating the clarity and jeopardy elements of his wrongful-discharge claim, because evidence presented by Swink showed no connections to the policy of furthering the competitive bid process and there were alternative means of promoting the policy. The majority reasons that because (1) there was a competitive bid for the project, (2) the bid was awarded to the lower or lowest bidder, (3) the bid specifications were followed at Swink's insistence, and (4) the Revised Code provides remedies to address when the lowest bidder has not been awarded a contract, Swink cannot survive summary judgment. However, this reasoning fails to recognize Swink's claims and supporting evidence that he was being pressured to accept changes to the contract after it had been awarded (not during the competitive bid process), that he was told he was "taking money out of people's pockets" by insisting on adherence to the contract specifications, and that ultimately he was fired for his insistence.

{¶ 29} There is no question that RTA established a violation by Swink of its employment manual and, accordingly, had a basis for discharge. The consideration of this fact, however, is not an issue in this analysis.

{¶ 30} Swink has established, sufficient to avoid summary judgment, that he was constructively discharged in violation of public policy. I would therefore reverse the decision of the trial court.