OPINION *Page 2 
{¶ 1} Defendants-appellants Wayne-Dalton Corp., Thomas B. Bennett, III and Bruce Boyle appeal from the October 30, 2006, Journal Entry, the January 23, 2007, Judgment and the January 23, 2007, Journal Entry of the Holmes County Court of Common Pleas. Plaintiff-appellee Ronald Schwenke has filed a Cross-Appeal.
 Statement of the Facts and Case {¶ 2} Appellant Wayne-Dalton is a privately held company that manufactures and sells garage doors, garage door openers and related products. Appellant Thomas B. Bennett, III is the President of appellant Wayne-Dalton while appellant Bruce Boyle is its Chief Financial Officer.
 {¶ 3} Appellee Ronald Schwenke was employed by appellant Wayne-Dalton, effective December 11, 2000, as Corporate Controller. Appellee was an at-will employee.
 {¶ 4} After he was terminated on July 29, 2004, appellee filed a complaint against appellants, alleging retaliation, violation of public policy, breach of contract, wrongful termination and age discrimination. Appellee, in his complaint, specifically alleged that he was discharged in retaliation for questioning the misappropriation of corporate assets and inappropriate accounting procedures that appellants Bennett and Boyle allegedly utilized. In his complaint, appellee also alleged that his discharge violated public policy because "it allows a company and/or individuals that are improperly and/or wrongfully conducting business to discharge an employee who raises concerns and/or objections to potential unlawful activity." Appellee, in his complaint, also sought unpaid wages, deferred compensation, vacation pay and punitive damages. *Page 3 
 {¶ 5} On December 2, 2005, appellants filed a Motion for Summary Judgment. Appellants, in their motion, which was supported by the affidavits of appellants Thomas B. Bennett, III and Bruce Boyle, among others, alleged that appellee was terminated due to his inability to work with his direct supervisor and with senior management, his negative and arrogant attitude and "the on-going degenerative nature of [his] work performance." Appellants further argued that appellee's claims for retaliation and wrongful discharge in violation of public policy "must fail as a matter of law [since] [appellee] has failed to enunciate a clear public policy that had been violated and since [appellee] failed to comply with the statutory requirements of O.R.C. Section 4113.52
[Ohio's Whistleblower statute]. . . ."
 {¶ 6} Appellee filed a response in opposition to appellants' Motion for Summary Judgment on July 3, 2006. Appellee, in his response, argued that R.C. 4113.52 was not applicable because he was not asserting that appellants' actions were criminally offensive, likely to cause imminent risk or physical harm to persons or a hazard to public health or safety. Appellee argued that there was a public policy in favor of not terminating an employee who reports inappropriate and unethical accounting procedures and misappropriation of company assets. Appellee, in the affidavit attached to his response, alleged, in relevant part, as follows:
 {¶ 7} "During my employment with Wayne-Dalton, defendant used the following inappropriate accounting procedures to transfer costs from Europe to the USA and mask Wayne-Dalton financial status:
 {¶ 8} "A. Wayne-Dalton corporate office would `issue' credits for expenses incurred in Europe (France was facility location). The driver of the amount of the credit *Page 4 
would be based on the financial deficit reflected on Europe's financials that the executives were looking to conceal. Credits would be issued against the Mt. Hope manufacturing facility and possibly other facilities:
 {¶ 9} "(i) The Wayne Dalton US facilities would as a matter of business sell products to Wayne-Dalton. As such the US had an ongoing receivable for which Europe would have to issue payments to the US. These `credits' would be used to offset legitimate receivables. The credit would reduce Wayne Dalton expenses, and the offset to A/R would allow for no exchange of cash for this specific issue:
 {¶ 10} "* Resulting in overstated Wayne-Dalton Europe profits;
 {¶ 11} "* Resulting in fictitious Wayne-Dalton cash flow;
 {¶ 12} "* Resulting a stronger appearing Wayne-Dalton Europe balance sheet;
 {¶ 13} "* Favorable credit terms from vendors for the Wayne-Dalton Europe entity;
 {¶ 14} "* Resulting in overstated costs in the USA and if the Credit was treated as a return, an understatement of revenues (same P L effect but in different areas of the income state);
 {¶ 15} "B. Wayne-Dalton corporate accounting personnel, under the direction of the executives, would write-up manual journal entries to decrease costs in Europe and increase costs in the US. On occasion there would be no credits issued, just a transfer of costs on paper that would inflate US costs while masking costs and losses in Europe;
 {¶ 16} "5. The foregoing process occurred on numerous occasions over a 3 ½ year period; *Page 5 
 {¶ 17} "6. I voiced my concerns about the continuing course of inappropriate accounting procedures to defendant Bennett, defendant Boyle, George Keller, Joseph Selogy several times between January 2001 and July 2004;
 {¶ 18} "7. Defendants misused company assets for personal gain. Specifically, defendant Bennett received massive personal loans (to fund personal assets such as homes) from Wayne-Dalton at interest rates significantly below the Fair Market Value (i.e. 2.5%) while earning large interest rates on their deferred compensation (i.e. 13% -17%). This occurred over a 3 ½ year period between January 2001 and July 2004. The inappropriate moving of costs across Wayne-Dalton facilities allowed for inaccurate bonus accruals, rewards, and deferred compensation accruals for Bennett and Boyle. Numerous employee (management, supervisory and non-supervisory) bonus awards (and sometimes departments) were subjectively lowered, with no basis, to decrease lower ranking employees' annual bonus payouts allowing for inflated executive (Bennett and Boyle knowingly) bonus and deferred compensation awards;
 {¶ 19} "8. I voiced my concerns about the misuse of company assets numerous times with Mr. Bennett, Mr. Boyle, Mr. Keller, Mr. Selogy, and Ms. Samuelson between January 2001 and July 2004;
 {¶ 20} "9. Defendants Boyle and Bennett were engaged in inappropriate accounting procedures and misappropriation of corporate assets. Specifically, defendants implemented the `3-B Plan', which allowed major shareholder Willis Mullet to receive undisclosed commissions in the amount of millions of dollars by selling products in Europe below costs (i.e. `dumping'); *Page 6 
 {¶ 21} "10. When I voiced my observations and concerns to defendants Boyle and Bennett about their inappropriate actions, I was told to `make it work' and perform my duties as Corporate Controller and not question how the business was being operated;
 {¶ 22} "11. When I refused to compromise my ethics and `make it work' according to defendants, I was fired."
 {¶ 23} Pursuant to an Opinion filed on July 11, 2006, the trial court denied appellants' Motion for Summary Judgment. The matter then proceeded to a jury trial on October 23, 2006.
 {¶ 24} At the conclusion of appellee's case in chief, appellants moved for a directed verdict. The motion was denied. Appellants moved for a directed verdict again at the conclusion of all of the evidence. Such motion also was denied.
 {¶ 25} Therefore, on October 27, 2006, the jury returned a verdict in favor of appellee and against appellant Bruce Boyle in the amount of $1,568.00. The jury, with respect to appellee's cause of action for wrongful termination, found for appellee and against appellants in the amount of $64,064.00. Finally, the jury awarded appellee punitive damages in the amount of $6,500.00. The jury further found that appellee was entitled to his attorney's fees.[1]
 {¶ 26} The trial court, in its October 30, 2006 Journal Entry, entered judgment in favor of appellee and against appellant Bruce Boyle in the amount of $1,568.00 plus interest at the rate of 10% per annum, and entered judgment in favor of appellee and against appellants, jointly and severally, in the amount of $70,564.00 plus interest at the *Page 7 
rate of 10% per annum. The trial court, in its entry, set a hearing on the amount of attorneys' fees to be awarded to appellee for January 12, 2007.
 {¶ 27} On November 7, 2006, appellee filed a Motion to Tax certain litigation expenses as court costs. The matter also was set for a hearing on January 12, 2007.
 {¶ 28} As memorialized in a Judgment filed on January 23, 2007, the trial court awarded appellee a total of $148,885.00 "as and for attorney's fees, paralegal fees, and legal assistant fees." In a Journal Entry filed the same day, the trial court awarded appellee $3,611.97 in court costs with interest at the rate of 10% per annum.
 {¶ 29} Appellants now raise the following assignments of error on appeal:
 {¶ 30} "I. THE TRIAL COURT ERRED AS A MATTER OF LAW IN DENYING DEFENDANTS/APPELLANTS' MOTION FOR SUMMARY JUDGMENT.
 {¶ 31} "II. THE TRIAL COURT ERRED AS A MATTER OF LAW IN DENYING APPELLANTS' MOTIONS FOR DIRECTED VERDICT AND BY SUBMITTING THE ISSUES PRESENTED IN THE CASE TO THE JURY FOR ITS CONSIDERATION.
 {¶ 32} "III. THE TRIAL COURT ERRED IN AWARDING PLAINTIFF ATTORNEY'S FEES IN THE AMOUNT OF $148,855 AND COSTS IN THE AMOUNT OF $3,611.97."
 {¶ 33} In turn, appellee raises the following assignments of error on cross-appeal:
 {¶ 34} "I. THE TRIAL COURT ERRED IN DENYING APPELLEE'S MOTION FOR NEW TRIAL OR, IN THE ALTERNATIVE, MOTION FOR ADDITUR ON THE ISSUE OF DAMAGES. *Page 8 
 {¶ 35} "II. THE TRIAL COURT ERRED IN DENYING APPELLEE'S MOTION FOR PREJUDGMENT INTEREST."
 I {¶ 36} Appellants, in their first assignment of error, argue that the trial court erred in denying their Motion for Summary Judgment "as appellee did not meet or satisfy the elements necessary to establish a viable public policy claim." We agree.
 {¶ 37} Summary judgment proceedings present the appellate court with the unique opportunity of reviewing the evidence in the same manner as the trial court. Smiddy v. The Wedding Party, Inc. (1987),30 Ohio St.3d 35, 36, 506 N.E.2d 212. Therefore, we must refer to Civ.R. 56(C), which provides, in pertinent part: "Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * * A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor."
 {¶ 38} Pursuant to the above rule, a trial court may not enter summary judgment if it appears that a material fact is genuinely disputed. The party moving for summary judgment bears the initial burden of informing the trial court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine *Page 9 
issue of material fact. The moving party may not make a conclusory assertion that the nonmoving party has no evidence to prove its case. The moving party must specifically point to some evidence which demonstrates that the nonmoving party cannot support its claim. If the moving party satisfies this requirement, the burden shifts to the nonmoving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. Vahila v. Hall,77 Ohio St.3d 421, 429, 1997-Ohio-259, 674 N.E.2d 1164, citing Dresher v. Burt (1996),75 Ohio St.3d 280, 293, 662 N.E.2d 264. It is based upon this standard that we review appellants' assignment of error.
 {¶ 39} Appellee, in his amended complaint, alleged that he was discharged in retaliation for raising concerns about alleged misappropriation of corporate assets and inappropriate accounting procedures to company officials and that his discharge violated public policy. Appellee further alleged that his wrongful termination was in violation of Ohio's public policy.
 {¶ 40} There is no dispute that appellee was an at-will employee. An employer may terminate an at-will employee for any lawful reason.Greeley v. Miami Valley Maintenance Contrs., Inc. (1990),49 Ohio St.3d 228, 551 N.E.2d 981. There are, however, exceptions to the general rule.
 {¶ 41} Pursuant to Greeley v. Miami Valley Maintenance Contractors,Inc. (1990), 49 Ohio St.3d 228, 551 N.E.2d 981, a discharged employee has a private cause of action sounding in tort for wrongful discharge where his or her discharge is in contravention of a "sufficiently clear public policy." Id. at 233, 551 N.E.2d 981 (Citation omitted). InGreeley, the Ohio Supreme Court recognized public policy was "sufficiently clear" where the General Assembly had adopted a specific statute forbidding an *Page 10 
employer from discharging or disciplining an employee on the basis of a particular circumstance or occurrence. The Greeley Court noted other exceptions might be recognized where the public policy could be deemed to be "of equally serious import as the violation of a statute." Id. at 235, 551 N.E.2d 981. "The existence of such a public policy may be discerned by the Ohio judiciary based on sources such as the Constitutions of Ohio and the United States, legislation, administrative rules and regulations, and the common law." Painter v. Graley (1994),70 Ohio St.3d 377, 384, 639 N.E.2d 51.
 {¶ 42} In order to establish a claim for wrongful termination in violation of Ohio public policy, a plaintiff must demonstrate:
 {¶ 43} "1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).
 {¶ 44} "2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).
 {¶ 45} "3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).
 {¶ 46} "4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element)." Id. at 384, fn. 8. (Emphasis added). See also Wiles v. Median AutoParts, 96 Ohio St.3d 240, 2002-Ohio-3994 at paragraphs 7-10.
 {¶ 47} The clarity and the jeopardy elements are questions of law and policy to be determined by the court. Collins v. Rizkana (1995),73 Ohio St.3d 65, 70, *Page 11 652 N.E.2d 653. The causation and overriding justification elements are questions of fact to be determined by the trier of fact. Id.
 {¶ 48} The crucial issue for determination is whether appellee demonstrated that a clear public policy existed that prevented his discharge (the "clarity element"). See Wiles, supra. As an initial matter, we note that appellee, in his brief, indicates that R.C.4113.52, Ohio's "Whistleblower Act," does not apply. R.C.4113.52(A)(1)(a) states in pertinent part: "If an employee becomes aware in the course of the employee's employment of a violation of any state or federal statute or any ordinance or regulation of a political subdivision that the employee's employer has authority to correct, and the employee reasonably believes that the violation is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety, a felony, or an improper solicitation for a contribution, the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the violation and subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation. * * *."
 {¶ 49} Such section establishes guidelines by which an employee can bring to the attention of the employer or appropriate authorities illegal activity by either the employer or a co-employee without being discharged. Keefe v. Youngstown Diocese of the Catholic Church (1997),121 Ohio App.3d 1, 5, 698 N.E.2d 1009. In order for an employee to be afforded protection as a "whistleblower," such employee must strictly comply with the dictates of R.C. 4113.52, and the failure to do so prevents the employee from claiming the protections embodied in the statute. Id., citing Contreras v. Ferro Corp. (1995), 73 Ohio St.3d 244,652 N.E.2d 940, syllabus. *Page 12 
 {¶ 50} While appellee, in his brief, argues that R.C. 4113.52 does not apply because appellants' actions were not criminally offensive, likely to cause imminent risk of physical harm to person or a hazard to public health or safety appellee maintains that there is still a public policy in support of not firing an employee, such as appellee, in retaliation for reporting inappropriate accounting procedures or misappropriation of corporate assets. In other words, appellee maintains that his claims allege actions by appellants which would not be covered by the "whistleblower" statute but are against a clear public policy.
 {¶ 51} However, in the case sub judice, we find that appellee has failed to identify any source of public policy as the basis for his claims. Appellee, in his response to appellants' Motion for Summary Judgment and in his appellate brief, did not identify any constitution, statute or regulation that might provide a basis for his claims. Nor did appellee cite or present the trial court with any legal authority in support of his argument that his termination violated public policy. Appellee merely alleged that he questioned appellants Boyle and Bennett about alleged inappropriate accounting practices and misappropriations of corporate assets and was fired and that his firing violated public policy. Appellee, in his response to appellants' Motion for Summary Judgment and his appellate brief, merely alleged that his firing violated public policy. In short, as noted by appellants, "[a]ppellee never offered any legal authority suggesting that [appellant's] conduct and alleged reaction from or by his employer forms a basis for a "public policy' exception to Ohio's at will relationship." In contrast, seeMiller v. Medcentral Health System, Inc., Richland App. No. 2005-CA-0049, 2006-Ohio-63. In Miller, a hospital food service employee was terminated after complaining about unsanitary practices she *Page 13 
observed in the hospital kitchen. She then sued the hospital operation alleging wrongful termination in violation of public policy. The employee identified two separate and distinct sources of public policy supporting her claim: (1) provisions of the Ohio Revised Code and the Ohio Administrative Code providing standards for handling and storage of food for human consumption, and (2) an Ohio Supreme Court case recognizing the common law public policy favoring work place safety. After the trial court granted summary judgment in favor of the hospital operator, the employee appealed.
 {¶ 52} On appeal, this Court reversed the judgment of the trial court. We specifically held, in part, that the trial court had erred in finding that the provisions of the Ohio Revised Code and the Ohio Administrative Code did not constitute the clearly established public policy of the State of Ohio. In contrast to the appellant in Miller, appellee did not identify any source of public policy supporting his claims.
 {¶ 53} Based on the foregoing, we find that appellee's claims for wrongful discharge and retaliation in violation of public policy must fail as a matter of law because appellee has failed to demonstrate that a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation or in the common law. We find, therefore, that appellee did not satisfy the "clarity" element as set forth in Greeley, supra and, therefore, cannot establish a claim for wrongful termination in violation of public policy. We find on such basis, that the trial court erred in denying appellants' Motion for Summary Judgment.
 {¶ 54} Appellants' first assignment of error is, therefore, sustained. *Page 14 
 II {¶ 55} Appellants, in their second assignment of error, argue that the trial court erred in denying their Motions for a Directed Verdict.
 {¶ 56} Based on our disposition of appellants' first assignment of error, appellants' second assignment of error is moot.
 III {¶ 57} Appellants, in their third assignment of error, argue that the trial court erred in awarding appellee attorney's fees in the amount of $148,855.00, costs in the amount of $3,611.97 and post-judgment interest.
 {¶ 58} Based on our disposition of appellants' first assignment of error, appellants' third assignment of error is sustained.
 Cross-Appeal {¶ 59} Based on our disposition of appellants' first assignment of error, appellee's two assignments of error on cross-appeal are overruled. *Page 15 
 {¶ 60} Accordingly, the judgment of the Holmes County Court of Common Pleas is reversed and this matter is remanded to the trial court for further proceedings.
[1] The jury found in favor of appellants and against appellee on appellee's causes of action for breach of contract and age discrimination.
 Edwards, J. Delaney, J. concur and Hoffman, P.J. concurs separately *Page 16